**YANKEE NETWORK, Inc. v. FEDERAL COMMUNICATIONS COMMISSION (NORTHERN CORPORATION, Intervener).**

**In re Station WMEX.**

**No. 7250.**

United States Court of Appeals for the District of Columbia.

Decided Aug. 14, 1939.

214

Paul D. P. Spearman, Alan B. David, and Frank Roberson, all of Washington, D. C., for appellant.

Hampson Gary, William H. Bauer, Fanney Neyman, William J. Dempsey, and Andrew G. Haley, all of the Federal Communications Commission, for appellee.

Arthur W. Scharfeld, Philip G. Loucks, Joseph F. Zias, and J. P. Tumulty, all of Washington, D. C., for intervener.

Before GRONER, Chief Justice, and STEPHENS and MILLER, Associate Justices.

MILLER, Associate Justice.

Prior to May 29, 1936, eight radio broadcasting stations—including the stations now owned by appellant and intervener herein—were operating in and near Boston, Massachusetts. On that date Intervener, The Northern Corporation (WMEX) was operating on the frequency

of 1500 kilocycles, with power of 100 watts night, 250 watts day, local sunset, unlimited time. It applied for a construction permit to operate on the 1470 kilocycle frequency, with 5 kilowatts power, unlimited time, using directional antenna both day and night. The Communications Commission granted the application, without a hearing subject to protest. Thereafter protests were filed by Bay State Broadcasting Corporation (WAAB), appellant's predecessor in interest, and by three other radio broadcasting station licensees. After appearances and hearing the Examiner recommended that all protests be dismissed and the application granted. The Commission acted accordingly, following oral arguments, and issued an order dated May 25, 1938, granting the application of WMEX, effective June 4, 1938. The Yankee Network, Inc., successor in interest of Bay State Broadcasting Corporation, and other licensees, filed petitions for rehearing, which were denied on September 6, 1938, and on September 24, 1938, The Yankee Network, Inc. appealed from the Commission's decision granting the application.

The Commission challenges the power of this court to hear the appeal. It contends in its brief that no appeal is contemplated by the Communications Act[1] from a decision of the Commission granting an application—on behalf of an existing licensee claiming to be economically affected. On oral argument it expanded its contention to include any possible grievance or affectation of interest, electrical, economic or otherwise, although in the present case, aggrievance resulting from affectation of economic interest is alone involved. In Journal Co. v. Federal Radio Comm., 60 App.D.C. 92, 94, 48 F.2d 461, 463,[2] we recognized the right of an aggrieved person to appeal from a decision of the Commission *granting* an application. Moreover, we have recently decided the issue adversely to the Commission's contention in Sanders Brothers Radio Station v. Federal Communications Comm., 70 App. D.C. 297, 106 F.2d 321. However, since

[1] Act of June 19, 1934, 48 Stat. 1064, as amended, 47 U.S.C.A. § 151 et seq.

[2] In that case it was held that before the Radio Act of 1927 was amended in 1930, a person prejudiced by the Commission's action in granting an application of another person for increased power had no right to appeal; that the Act

was amended to give existing licensees just that right. This portion of the Radio Act was reenacted in the form of Section 402(b) of the 1934 Act and we can presume that the language was used in the latter Act in the same sense as in the former. Pott v. Arthur, 104 U. S. 735, 736, 26 L.Ed. 909.

the Commission has strenuously urged that we reconsider the problem, a thorough analysis of its arguments in the present case will conduce to a final determination of this important question.

■ The court's jurisdiction depends, in this case, upon the meaning of Section 402(b) (2): "An appeal may be taken * * *. By any other person aggrieved or whose interests are adversely affected by any decision of the Commission *granting* or *refusing* any such application."[3] [Italics supplied] It will not be seriously contended that this language should be given its broadest literal meaning. Congress could not have intended to permit an appeal by any person who might suffer pain or sorrow as a result of the Commission's action, because, for instance, he might dislike, generally, all radio broadcasting, or certain phases thereof in particular. The Commission suggests that the necessary implications of the interpretation given to the appeal section in the Sanders Brothers case—permitting appeal by one adversely economically affected—would produce a result almost as extreme and would extend its operation to include newspapers, magazines and other advertising media of all kinds. But there is nothing in the Act to suggest that the section should be extended so far. The Act pertains to radio broadcasting. The Commission's power in this respect is confined to the regulation of those whom it licenses or declines to license to broadcast and to those who provide facilities for broadcasting.[4] Without deciding whether there may be others who come within the privilege of appeal granted by Section 402(b) (2), it seems obvious that the clause was intended to include existing licensees—assuming they are able to show, in the particular case, actual aggrievance or affectation of interest. Who could have been more in the contemplation of Congress as aggrieved persons than existing licensees, whose very existence and possibility of success depend upon the wise exercise by the Commission of its discretionary powers?[5]

■ The Commission concedes in its brief that existing licensees may actually be aggrieved by its action in granting new applications.[6] Moreover, the Commission concedes the possibility of arbitrary action upon its part, which should be subjected to judicial review.[7] But it contends that however improperly it may have acted in a given case, this court has no jurisdiction to entertain an appeal brought by an existing licensee, under Section 402(b) (2), because, it says, an erroneous decision of the Commission invades no *legal rights* or *legal interests* of such a licensee and, under such circumstances, "this court may not, regardless of the merits of the case, assume jurisdiction." It urges that the test by which a person's appealable interest under Section 402(b) (2) may properly be determined is to inquire whether—if that section were not in effect—he would have a right to resort to the District Court for the protection of the legal right or interest which he claims to be aggrieved or adversely affected. Measured by this test, it is contended that appellant in the present case has no appealable interest, for, the Commission says, it has been held many times that, in the absence of statute, a person has no legal right to be free of com-

---

[3] 48 Stat. 1093, 47 U.S.C.A. § 402(b) .(2).

[4] See Telegraph Herald Co. v. Federal Radio Comm., 62 App.D.C. 240, 242, 66 F.2d 220, 222.

[5] Cf. Telegraph Herald Co. v. Federal Radio Comm., 62 App.D.C. 240, 66 F. 2d 220.

[6] It says: "Unquestionably, the Commission should, in determining whether the 'public interest, convenience, and necessity' will be served by the licensing of a new station in a community, give careful and painstaking consideration to the question of whether the effect of granting the new license will be to defeat the ability of the holder of any one or more outstanding licenses to carry on in the public interest. The Commission is entirely in accord with the view that, if the effect of granting a new license would be to defeat the ability of the holder of an outstanding license to carry on in the public interest, the application for the new station should be denied unless there are 'overweening' reasons of a public nature for granting it. And the Commission also believes that it is obviously a stronger case where neither licensee will be financially able to render adequate service."

[7] Upon this point it says: "It is also the Commission's position that whenever the Commission, in considering an application for a new station does not so apply the standard of public interest, convenience and necessity as required by the statute, this court, *upon an appeal properly taken*, may and should set aside the decision of the Commission."

petition and that injury suffered or threatened by competition is damnum absque injuria.[8]

However, the criterion proposed is not a proper one, for here we are dealing with rights not as they existed at common law but as they exist and are administered under an act of Congress. Cf. Alabama Power Co. v. Ickes, 302 U.S. 464, 484, 485, 58 S.Ct. 300, 82 L.Ed. 374. Many of the acts which have established administrative agencies, such as the Federal Communications Commission, have created rights and interests[9] as to which administrative remedies must first be exhausted before judicial review may be sought of administrative action concerning them.[10] Such rights are none the less valuable from a practical point of view.[11] The Commission concedes that if a statute confers a right upon a licensee to be protected against competition then he has a right to complain, under the authority of Clarksburg-Columbus Short Route Bridge Co. v. Woodring, 67 App.D.C. 44, 89 F.2d 788, rev'd on other grounds, 302 U.S. 658, 58 S.Ct. 365, 82 L.Ed. 509. The dissent

in that case, upon which the Commission relies, maintained that the statute conferred no substantive "and therefore no adjective rights" upon the party affected because the statute imposed no duty upon the Secretary of War to consider competitive effects upon that party. It is difficult to reconcile the Commission's position respecting that case with its admission that the Commission—in determining whether public interest, convenience and necessity will be served by the granting of a new license—must consider the effect thereof upon existing licensees.

█ No language of the present Act, relating to grants of rights to licensees, suggests an intent to recognize or to vitalize any common law rights in radio broadcasting or in the use of frequencies therefor. Some of its language definitely repudiates the idea.[12] The purpose expressly declared in Section 301 and revealed in subsequent sections, is inconsistent with recognition of common law rights. But the Act does definitely recognize the *rights* of license holders in express terms no less than seven times.[13] Moreover, in Section 606 of

[8] Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543; Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; United States ex rel. New York Warehouse, Wharf & Terminal Ass'n, Inc. v. Dern, 63 App. D.C. 28, 68 F.2d 773, certiorari denied 292 U.S. 642, 54 S.Ct. 776, 78 L.Ed. 1494; Franklin Tp. v. Tugwell, 66 App. D.C. 42, 85 F.2d 208.

[9] See, e. g., National Labor Relations Act, 49 Stat. 449, 452, 29 U.S.C.A. §§ 151, 157; Act to Regulate Commerce, as amended by Transportation Act of 1920, 41 Stat. 456, 49 U.S.C.A. § 1(18-20); The Chicago Junction Case, 264 U.S. 258, 267, 44 S.Ct. 317, 68 L.Ed. 667; Western Pacific California R. Co. v. Southern Pacific Co., 284 U.S. 47, 51, 52 S.Ct. 56, 76 L.Ed. 160.

[10] It is a well established principle of judicial administration that prescribed administrative remedies must first be exhausted before a person is entitled to judicial relief for a supposed or threatened injury. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50, 51, 58 S.Ct. 459, 82 L.Ed. 638; United States v. Illinois Central R. Co., 291 U.S. 457, 463, 54 S.Ct. 471, 78 L.Ed. 909.

[11] Frost v. Corporation Comm., 278 U. S. 515, 521, 49 S.Ct. 235, 73 L.Ed. 483.

[12] "Sec. 304. No station license shall be granted by the Commission until

the applicant therefor shall have signed a waiver of any claim to the use of any particular frequency or of the ether as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise." 47 U.S.C.A. § 304.

[13] "Sec. 301. * * * no such license shall be construed to create any *right, beyond the terms,* conditions, and periods of the license."

"Sec. 309. * * * (b) * * * (1) The station license shall not vest in the the licensee any *right* to operate the station nor any *right* in the use of the frequencies designated in the license *beyond the term* thereof nor in any other manner than authorized therein.

"(2) Neither the license nor the *right granted thereunder* shall be assigned or otherwise transferred in violation of this Act [chapter]."

"Sec. 310. * *. * (b) The station license required hereby, the frequencies authorized to be used by the licensee, and the *rights* therein granted shall not be transferred, assigned, or * . * * disposed of * * * unless the Commission shall * * * decide that said transfer is in the public interest, and shall give its consent in writing."

"Sec. 313. * * * Whenever in any suit, action, or proceeding * * * any licensee shall be found guilty of the violation of the provisions of such laws.

the Act, licensees are referred to as *owners* of stations. And their ownership is recognized by the Commission in its brief where it says: "It should be noted that as of the date this appeal was taken, Stations WNAC and WAAB were owned and operated by the same licensee, namely, The Yankee Network, Inc." This admission must be read in the light of the fact that no person is permitted to use or operate a radio broadcasting station in the United States except pursuant to a license granted under the provisions of the Communications Act (§ 301). The Act provides that one shall be guilty of a crime if he does wilfully and knowingly operate such a station without a license (§ 501), or even if he shall wilfully and knowingly violate any rule, regulation, restriction or condition made or imposed by the Commission under authority of the Act (§ 502). It is apparent, therefore, that a radio broadcasting station is valueless without a license to operate it. It is equally apparent that the granting of a license by the Commission creates a highly valuable property right, which, while limited in character, nevertheless provides the basis upon which large investments of capital are made and large commercial enterprises are conducted.[14] As it is the purpose of the Act to secure the use of the channels of radio communication by private licensees under a competitive system, those licensees must be protected in that use, not merely from unlicensed stations[15] and unlicensed operators,[16] but from improper activities of licensed stations[17] and operators,[18] and from arbitrary action by the Commission,

itself, in the exercise of its regulatory power.

In asserting its rights as a licensee, appellant is not limited, therefore—as the Commission's argument seems to imply— either to the appeal section, or to the Commission's procedural rules governing intervention.[19] The legal rights or interests which are asserted in a petition for intervention are created under the Act by the grant of a license, and the same rights are asserted on appeal under either subdivision (1) or (2) of Section 402(b). The importance of intervention is that it advises the Commission of the rights or interests which are asserted, and provides opportunity for it to make a determination consistent with those rights and interests, and consistent with the public interest, convenience and necessity as well. We have held[20] that one who claims to be an interested party—if he has notice of the proposed action of the Commission—should intervene. We have held, also, that under some circumstances it may be proper and perhaps even essential for an interested person to petition for a rehearing.[21] The use of these procedural devices is not for the purpose of creating rights, or interests, however, but for protecting existing rights and interests. See Red River Broadcasting Co., Inc. v. Federal Communications Comm., 69 App.D.C. 1, 5, 98 F.2d 282, 286, certiorari denied 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400.

In the same manner as the rights and equities of licensees are statutory in character so are their remedies.[22] The Com-

---

or any of them, the court * * * may adjudge * * * that the license of such licensee shall * * * be revoked and that all *rights* under such license shall thereupon cease * * *."

"Sec. 319. * * * (b) * * * The *rights* under any such permit shall not be assigned or otherwise transferred to any person without the approval of the Commission. * * *" [Italics supplied] 47 U.S.C.A. §§ 301, 309(b)(1, 2), 310(b), 313, 319(b).

[14] Cf. Frost v. Corporation Comm., 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483; Alabama Power Co. v. Ickes, 302 U.S. 464, 484, 58 S.Ct. 300, 82 L.Ed. 374; City of Campbell v. Arkansas-Missouri Power Co., 8 Cir., 55 F.2d 560, 562.

[15] Section 301, 47 U.S.C.A. § 301.

[16] Sections 303(*l*), 318, 47 U.S.C.A. §§ 303(*l*), 318.

[17] Section 312 (a), 47 U.S.C.A. § 312 (a).

[18] Section 303(m), as amended, 47 U. S.C.A. § 303(m).

[19] Rules No. 105.20, 102.6, 106.7, F.C. C.Rules, approved Dec. 18, 1935; see also rules No. 6.02, 8.06, 12.50, F.C.C. Rules, effective Jan. 1, 1939; and rules No. 1.102, 1.54, 1.204, F.C.C.Rules, effective Aug. 1, 1939.

[20] Red River Broadcasting Co., Inc. v. Federal Communications Comm., 69 App. D.C. 1, 98 F.2d 282, certiorari denied 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400.

[21] Ibid; Southland Industries, Inc. v. Federal Communications Comm., 69 App. D.C. 82, 99 F.2d 117.

[22] Black River Valley Broadcasts, Inc. v. McNinch, 69 App.D.C. 311, 101 F.2d 235, certiorari denied 59 S.Ct. 793, 83 L.Ed. 1501. See Telegraph Herald Co.

mission is empowered by the Act to grant or deny an application for a station license.[23] But the applicant is privileged to appeal from an adverse decision.[24] The Commission is authorized to regulate and to discipline existing licensees, to modify their licenses and to determine, upon the basis of their respective performances, whether their licenses shall be renewed. But if the Commission decides their applications for modification or renewal adversely, such licensees are entitled to appeal.[25] A radio operator whose license has been suspended is entitled to appeal from the Commission's decision.[26] Provision is made by Section 606 of the Act, that an existing licensee whose radio station is closed or whose station and equipment are used or controlled by the Government during war, threat of war, public peril, disaster or emergency or to preserve the neutrality of the United States, shall be given compensation therefor. In fact express provision is made for suit by such licensee against the United States to recover compensation.[27] In none of these situations can it be contended that a legal right or legal interest, known to the common law, must be violated before the privilege of appeal may be enjoyed. And in none of them would a licensee be privileged to assert its rights and equities except in the manner prescribed by the statute.[28] To contend that an administrative remedy provided under such circumstances must be interpreted in terms of rights which might have been protected in a court of law, would beg the question.

By the same token the Commission's contention fails when applied to the appellant in the present case. There is no difference between its rights and equities and those of the licensees mentioned in the preceding paragraph. In each case they are the statutory rights referred to throughout the Act, and which arise from the granting of the license. In each case they are the equities to which the Supreme Court referred in the Nelson Brothers case.[29] It was equally the intention of Congress to protect the rights and equities of licensees against arbitrary action of the Commission in one case as in the other.

In an effort to distinguish the Nelson Brothers case[30] and to show that our reference to it was unjustified in our recent decision in the Sanders Brothers case,[31] the Commission urges that Nelson Brothers had a *statutory right* to appeal. It is for exactly that reason that all three cases are analogous. In the Nelson Brothers case,

---

v. Federal Radio Comm., 62 App.D.C. 240, 66 F.2d 220. Cf. Old Colony Trust Co. v. Commissioner of Internal Revenue, 279 U.S. 716, 722, 723, 49 S.Ct. 499, 73 L.Ed. 918; McGuire, Judicial Reviews of Administrative Decisions, 26 Georgetown L.J. 574; Note, 48 Yale L.J. 1257.

[23] Sections 307(a), 309(a), 47 U.S.C.A. §§ 307(a), 309(a).

[24] Section 402(b)(1), 47 U.S.C.A. § 402 (b)(1).

[25] Ibid.

[26] Section 402(b)(3), 47 U.S.C.A. § 402 (b)(3).

[27] Section 606(d), 47 U.S.C.A. § 606(d). Cf. Pulitzer Pub. Co. v. Federal Communications Comm., 68 App.D.C. 124, 94 F.2d 249, holding that a license is received subject to right of the Government to withdraw it in public interest *without* compensation.

[28] See Black River Valley Broadcasts, Inc. v. McNinch, 69 App.D.C. 311, 101 F.2d 235, certiorari denied 59 S.Ct. 793, 83 L.Ed. 1501.

[29] Federal Radio Comm. v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406. See opinion of Groner, J., in Sykes v. Jenny Wren Co., 64 App. D.C. 379, 384, 78 F.2d 729, 734, 104 A.L.R. 864. See also, Chicago Federation of Labor v. Federal Radio Comm., 59 App.D.C. 333, 334, 41 F.2d 422, 423: "It is not consistent with true public convenience, interest, or necessity, that meritorious stations * * * should be deprived of broadcasting privileges *when once granted to them,* which they have at great cost prepared themselves to exercise, unless clear and sound reasons of public policy demand such action. The cause of independent broadcasting in general would be seriously endangered and public interests correspondingly prejudiced, if the licenses of established stations should arbitrarily be withdrawn from them, and appropriated to the use of other stations. This statement does not imply any derogation of the controlling rule that all broadcasting privileges are held subject to the reasonable regulatory power of the United States, * * *." [Italics supplied]; Telegraph Herald Co. v. Federal Radio Comm., 62 App.D.C. 240, 242, 66 F. 2d 220, 222.

[30] 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406.

[31] 70 App.D.C. 297, 106 F.2d 321.

as in the present case, the owner of an existing station applied for the allocation of another frequency. The frequency applied for happened to be the one theretofore assigned to Nelson Brothers. The latter protested, but the Commission nevertheless granted the application and Nelson Brothers appealed from its decision. In that case—upon the applicant's suggestion[32]—the Commission included in its order the deletion of the Nelson Brothers station. It should be noted, therefore, that in that case, as in the present case, the appeal was from a decision granting—not denying—an application. It is true, as the Commission contends, that the injury suffered or to be suffered in the Nelson Brothers case resulted from a reallocation of frequencies and a deletion of an existing station. But it may be equally disastrous to the first licensee, for the Commission to license so many new competing stations as to destroy it. There would be no value in a *right* to use a designated frequency or in *equities* relating thereto—which would justify the great financial outlays involved in station construction and operation—if the licensee were not protected from destructive competition. Equities and rights do not exist in a vacuum but in relation to the total situation of which they are a part. The Commission has control of that situation, by virtue of its power to grant or deny licenses. But the power is not absolute. "In granting licenses the Commission is required to act 'as public convenience, interest or necessity requires.' This criterion is not to be interpreted as setting up a standard so indefinite as to confer an unlimited power. Compare New York Central Securities Corp. v. United States, 287 U.S. 12, 24, 53 S.Ct. 45, 77 L.

Ed. 138. The requirement is to be interpreted by its context, by the nature of radio transmission and reception, by the scope, character and quality of services, and, where an equitable adjustment between States is in view, by the relative advantages in service which will be enjoyed by the public through the distribution of facilities. In making such an adjustment the equities of existing stations undoubtedly demand consideration. They are not to be the victims of official favoritism."[33]

The only difference, therefore, between the situation of the present case and those contemplated in Section 402(b) (1) is the way in which the threatened destruction of appellant's rights and equities is alleged to have occurred. This is no sufficient difference to require us to hold that Congress intended to limit aggrieved persons or interested persons to those whose applications had been denied or to those possessed of legal rights known to the common law. If it had so intended it could easily have said so. As it did not, and as reason and justice require the opposite result, the conclusion follows logically that the appellant is definitely the person whom Congress had in mind in Section 402(b) (2). This becomes particularly obvious when we consider that to accept the argument of the Commission on this point would not only leave the licensee without opportunity for any relief whatever, even from action so arbitrary as to destroy it, but would deprive Section 402(b) (2) of meaning and eliminate it from the Act as effectively as if it were repealed. We cannot impute to Congress an intent to produce an absurd result.[34] "There is a presumption against a construction which

---

[32] Nelson Bros. Bond & Mortgage Co. v. Federal Radio Comm., 61 App.D.C. 315, 316, 62 F.2d 854, 855.

[33] Federal Radio Comm. v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406. And, as Justice Groner said in Sykes v. Jenny Wren Co., 64 App. D.C. 379, 384, 78 F.2d 729, 734, 104 A.L.R. 864: "Granting that those who operate broadcasting stations do so subject to the Commission's power of regulation, this power is not an unlimited power; and the Commission's licensees, who on the faith of the license have invested money and established a goodwill, thereafter undoubtedly have rights, which, though they may be revoked in the public interest, nevertheless may not be

arbitrarily or capriciously destroyed. * * * If it were otherwise, the millions of dollars invested in radio broadcasting stations would be wholly subject to the caprice or favor of the regulatory body. Such a grant of power would be so clearly unreasonable, so oppressive, and so partial as to make it unthinkable, without more, that the Congress ever intended to grant it. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L. Ed. 220. * * *"

[34] "'A well-settled rule of statutory construction enjoins courts not to attribute to the Legislature a construction which leads to absurd results.'" Red River Broadcasting Co., Inc. v. Federal Communications Comm., 69 App.D.C. 1, 6, 98 F.2d 282, 287, certiorari denied,

would render a statute ineffective or inefficient, or which would cause grave public injury or even inconvenience."[35] It would require a statute susceptible of no other possible interpretation to persuade us to adopt such a construction in the present case. In order to safeguard the great values of administrative procedure it is necessary to avoid extremes of administrative absolutism.

In our decision in the Sanders Brothers case,[36] we referred to dicta which appears in previous decisions of this court;[37] and to the opinion of Justice Groner in the Jenny Wren case.[38] The latter paraphrases language—originally used in the Texas and Pacific case[39]—to describe the underlying purpose of the Communications Act as follows: " * * * the act recognizes the preservation of the earning capacity, and conservation of the financial resources, of the individual broadcasting station as a matter of national concern, for the reason that the property employed must be permitted to earn a reasonable return or the system will break down; thus indicating, as it seems to me, an identical or reciprocal interest between the owner and the public, in which it is the right of either to see that competition between stations is not carried to the point of destruction."

The Commission denies the applicability of the paraphrased language to radio broadcasting. It calls attention to the fact that in the Communications Act Congress specified a different method of regulation for common carriers engaged in interstate communication by radio than for radio broadcasters;[40] that broadcast licensees are expressly exempted, in the definition section of the Act, from the classification of common carriers;[41] and that such a li-

censee "has unregulated discretion to determine the rates necessary to insure the profitable operation of his station in the area served." It refers to the decision of this court in Pulitzer Pub. Co. v. Federal Communications Comm., 68 App.D.C. 124, 126, 94 F.2d 249, 251, in which we said that a radio broadcasting station is a public utility in a more restricted sense than a railroad or other common carrier and that the term, "public convenience, interest, or necessity," should be given a less broad meaning than is applied to it elsewhere in public utility legislation. It contends that in the regulation of radio broadcasting Congress intended that monopolies should be prevented rather than protected; that while under the Transportation Act, the power to regulate rates and the necessity of maintaining fair competition, resulted logically in requiring that a carrier should have a right to protest against regulatory action which produced economic injury, under the Communications Act "A station owner's rights are subject to the paramount authority of Congress to exercise reasonable regulation of broadcasting." And, the Commission concludes, the interpretation placed by the Supreme Court upon the Transportation Act cannot properly be applied by analogy to that portion of the Communications Act which deals with radio broadcasting as distinguished from radio communication for hire by a common carrier.

But in spite of these differences the two Acts contain vital similarities which make analogy proper, and the conclusion of the Commission is a non sequitur. Radio broadcasting, the subject of one, is affected with a public interest in fully equal measure as is railway transportation, the

305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400. See United States v. Katz, 271 U.S. 354, 357, 46 S.Ct. 513, 70 L.Ed. 986; Donnelly Garment Co. v. International Ladies' Garment Workers' Union, 8 Cir., 99 F.2d 309, 317, certiorari denied 305 U.S. 662, 59 S.Ct. 364, 83 L.Ed. 430; United States ex rel. Anderson v. Anderson, 8 Cir., 76 F.2d 375, 378; United States v. Oregon & California R. Co., 164 U.S. 526, 539, 17 S.Ct. 165, 41 L.Ed. 541; Lau Ow Bew v. United States, 144 U.S. 47, 59, 12 S.Ct. 517, 36 L.Ed. 340.

[35] United States v. Powers, 307 U.S. 214, 59 S.Ct. 805, 807, 83 L.Ed. 1245. See Bird v. United States, 187 U.S. 118, 124, 23 S.Ct. 42, 47 L.Ed. 100; Van Dyke v. Geary, D.C.Ariz., 218 F. 111, 126; Har-

ris v. Bell, 8 Cir., 250 F. 209, 217, affirmed 254 U.S. 103, 41 S.Ct. 49, 65 L.Ed. 159.

[36] 70 App.D.C. 297, 106 F.2d 321.

[37] Great Western Broadcasting Ass'n, Inc. v. Federal Communications Comm., 68 App.D.C. 119, 94 F.2d 244; Pulitzer Pub. Co. v. Federal Communications Comm., 68 App.D.C. 124, 94 F.2d 249.

[38] 64 App.D.C. 379, 384, 78 F.2d 729, 734, 104 A.L.R. 864.

[39] Texas & Pacific Ry. v. Gulf, Colorado & Santa Fe Ry. Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578.

[40] Communications Act, § 201 et seq., 48 Stat. 1070, 47 U.S.C.A. § 201 et seq.

[41] Communications Act, § 3(h), 48 Stat. 1064, 1066, 47 U.S.C.A. § 153(h).

subject of the other. Congress recognized this fact by making the Communications Act speak in terms of the public interest from beginning to end. "There is no closed class or category of businesses affected with a public interest * * *. The phrase * * * can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good."[42] This court has said that the radio business is impressed with a public interest,[43] and, further, that Congress, in establishing the standard of public interest, convenience, and necessity, evidently had in mind that broadcasting should be of a public character rather than a mere adjunct of a particular business.[44] Rate fixing is only one of many regulatory procedures.[45] The fact that it is specified for carriers and not for broadcasters is by no means conclusive. In both Acts other forms of regulation are specified, which are closely similar; as for example, the power of the appropriate commission in each case to require adequate facilities.[46] The powers of regulation possessed by the Federal Communications Commission over broadcasters are comprehensive and inclusive;[47] and judicial review of its actions is highly im-

[42] Nebbia v. New York, 291 U.S. 502, 536, 54 S.Ct. 505, 515, 78 L.Ed. 940, 89 A.L.R. 1469; Frost v. Corporation Comm., 278 U.S. 515, 520, 49 S.Ct. 235, 73 L.Ed. 483. See Tyson & Brother v. Banton, 273 U.S. 418, 47 S.Ct. 426; 71 L.Ed. 718, 58 A.L.R. 1236.

[43] Pulitzer Pub. Co. v. Federal Communications Comm., 68 App.D.C. 124, 126, 94 F.2d 249, 251.

[44] KFKB Broadcasting Ass'n, Inc. v. Federal Radio Comm., 60 App.D.C. 79, 47 F.2d 670.

[45] Regulation has taken many forms: Federal regulation of labor conditions (National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352); limiting hours of labor in particular occupations (Holden v. Hardy, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780); prohibiting child labor (Sturges & Burn Mfg. Co. v. Beauchamp, 231 U.S. 320, 34 S.Ct. 60, 58 L.Ed. 245, L.R.A. 1915A, 1196); insuring compensation for industrial accidents (New York Central R. Co. v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A.1917D, 1, Ann. Cas.1917D, 629); prohibiting night work for women (Radice v. New York, 264 U.S. 292, 44 S.Ct. 325, 68 L.Ed. 690); forbidding or regulating particular business (Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U.S. 412, 426, 427, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293); establishing minimum wages for women (West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330); reducing hours of labor for women (Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551, 13 Ann.Cas. 957; Miller v. Wilson, 236 U.S. 373, 35 S.Ct. 342, 59 L.Ed. 628, L.R.A.1915F, 829); requiring public weighing of grain (Merchants Exchange v. Missouri ex rel. Barker, 248 U.S. 365, 39 S.Ct. 114, 63 L.Ed. 300); regulating sales in bulk of stock in trade (Lemieux v. Young, 211 U.S. 489, 29 S.Ct. 174, 53 L.Ed. 295); providing for guarantee of bank deposits (Noble State Bank v. Haskell, 219 U.S. 104, 31 S.Ct. 186, 55 L. Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas. 1912A, 487); prohibiting monopolies (United Shoe Machinery Corp. v. United States, 258 U.S. 451, 462-464, 42 S.Ct. 363, 66 L.Ed. 708; United States v. Joint Traffic Ass'n, 171 U.S. 505, 559, 571-573, 19 S.Ct. 25, 43 L.Ed. 259); preventing unfair trade practices (Federal Trade Comm. v. Klesner, 274 U.S. 145, 151, 47 S.Ct. 557, 71 L.Ed. 972; Federal Trade Comm. v. Raladam Co., 283 U.S. 643, 647, 51 S.Ct. 587, 75 L. Ed. 1324, 79 A.L.R. 1191); prescribing terms upon which business may contract (Hardware Dealers' Mut. Fire Ins. Co. v. Glidden Co., 284 U.S. 151, 52 S.Ct. 69, 76 L.Ed. 214).

[46] Transportation Act, 41 Stat. 474, 478, 49 U.S.C.A. § 1(21).

[47] The large scope of the Commission's regulatory powers includes the following: (§ 303) Power to classify stations; prescribe the nature of the service to be rendered by each class of stations and by each station within a class; assign frequencies to classes and to stations; determine the location of stations; regulate the apparatus to be used by each station; make regulations to prevent interference between stations; establish areas or zones to be served by stations; make special regulations applicable to chain broadcasting; require stations to keep records of programs and transmissions of energy; prescribe qualifications of station operators; classify, license, and suspend licenses of such operators; inspect radio installations; designate call letters; require painting and/or illumination of radio towers; make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of the Act; (§

portant just as it is in the case of the Interstate Commerce Commission.

In the regulation of radio broadcasting as distinguished from transportation or radio communication, Congress was dealing with a newer and less well established form of public service. As the Supreme Court said in the Panama Refining case:[48] "Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply." In some respects the powers delegated by Congress for the regulation of broadcasters are even more drastic than those possessed by the Interstate Commerce Commission over railroad carriers; notably the power of the Federal Communications Commission to issue licenses for short periods, and to require, each time, a full showing of financial and other qualifications, as a condition of renewal. Such a regulation applied to the railroads of the United States would probably soon disrupt them.

Congress had power to provide safeguards against destructive economic injury to existing licensees, and did so in both Acts, in order to secure a similar legislative purpose in each. In the case of the railroads Congress waited until the condition of many of them was desperate. The Commission argues that the Transportation Act and the recent Emergency Railroad Transportation Act[49] were intended "to administer oxygen to critical patients."[50] But in the case of radio broadcasters the intent of Congress was to anticipate and prevent desperate, chaotic conditions.[51] The latter form of statesmanship is equally as commendable as the former, and may serve better the interests of the people. In both instances the privilege of free enterprise was curtailed.

In each case Congress has delegated the power to regulate public utilities in interstate commerce for the purpose of safe-

303) grant station licenses; modify and review licenses; specify the form of applications and require that they set forth information concerning citizenship, character, financial, technical and other qualifications of applicants, the ownership and location of proposed stations and other information; (§ 309) determine whether station licenses, the rights therein granted, and the authorized frequencies may be transferred, assigned, or otherwise disposed of; (§ 312) revoke licenses for failure to operate as set forth therein, or for violation of or failure to observe "any of the restrictions and conditions of this Act or of any regulation of the Commission authorized by this Act"; (§ 315) make rules and regulations to carry into effect the requirement of the Act that equal opportunities must be provided for use of candidates for public office; (§ 317) announcement of sponsorship of broadcast advertising; (§ 318) make special regulations governing the use and operation of automatic radio devices; (§ 319) grant construction permits; (§ 320) designate stations liable to interfere with distress signals and to require that a licensed radio operator be kept listening in for such signals "during the entire period the transmitter of such station is in operation." Prohibitions contained in the Act, with respect to which the Commission is empowered to adopt imple-

menting rules and regulations, include (§ 316) prohibition against broadcasting any advertisement of or information concerning any lottery, gift enterprise, or similar scheme; (§ 317) against broadcasting any matter for which service, money, or any other valuable consideration is paid without announcing that it is so paid for or furnished and by whom; (§ 326) against the uttering of obscene, indecent, or profane language by means of radio communication. 47 U.S.C.A. §§ 303, 308, 309, 312, 315–320, 326.

[48] Panama Refining Co. v. Ryan, 293 U.S. 388, 421, 55 S.Ct. 241, 248, 79 L. Ed. 446.

[49] Act of June 16, 1933, 48 Stat. 211, 49 U.S.C.A. § 250 et seq.

[50] Louisville & N. R. Co. v. United States, D.C.N.D.Ill., 10 F.Supp. 185, 192.

[51] General Electric Co. v. Federal Radio Comm., 58 App.D.C. 386, 389, 31 F.2d 630, 633, certiorari dismissed 281 U.S. 464, 50 S.Ct. 389, 74 L.Ed. 969: "Without such national regulation of radio, a condition of chaos in the air would follow, and this peculiar public utility, which possesses such incalculable value for the social, economical, and political welfare of the people, and for the service of the government, would become practically useless."

guarding a dual interest, involving a reciprocal and correlative relationship between the public and the owner of the utility. As between the two, the public interest is of greater importance. Therein lies the justification for governmental regulation, and for placing in the hands of such administrative agencies as the Federal Communications Commission powers, which if arbitrarily exercised, may destroy the very subject of regulation. It is entirely true, as the Commission in this case argues, that "A station owner's rights are subject to the paramount authority of Congress to exercise *reasonable regulation* of broadcasting." [Italics supplied] It is equally true that carriers are subject to *similar reasonable* regulation of transportation. But it would be absurd, in one case as well as in the other, to contend that Congress intended to permit such arbitrary and uncontrolled exercise of power as would destroy meritorious and respectable licensees which had been thus selected to serve the public interest and to achieve the major purpose of each Act. We said in Journal Co. v. Federal Radio Comm.,[52] that "The installation and maintenance of broadcasting stations involve a very considerable expense. Where a broadcasting station has been constructed and maintained in good faith, it is in the interests of the public and common justice to the owner of the station that its status should not be injuriously affected, except for compelling reasons."

The Commission attempts to support its position by arguing that "one of the chief concerns of Congress, as evidenced by the reports and debates, was to guard against monopolies and to preserve competition." It is difficult to understand how this result could be achieved by deliberately or carelessly licensing so many new competing stations as to destroy already existing ones, and possibly the newly created ones as well. While it is true that it was the intention of Congress to preserve competition in broadcasting, and while it is true that such intention was written into Section 314 of the Communications Act, it certainly does not follow therefrom that Congress intended the Commission to grant or deny an application in any case, other than in the interest of the public. Just as a monopoly—which may re-

sult from the action of the Commission in licensing too few stations—may be detrimental to the public interest, so may destructive competition, effected by the granting of too many licenses. The test is not whether there is a monopoly, on the one hand, or an overabundance of competition, on the other, but whether the granting or denying of the application will best serve the interest of the public.

In order to attain the purposes of the Act, the Commission must assume the full responsibility cast upon it by Congress with respect to each applicant and each protesting licensee. In order to insure full assumption of that responsibility and full performance of its duty, in situations such as exist in the present case, Congress made the Commission's action subject to judicial review. In the absence of such possibility of review the Commission—while admitting its duty—could arbitrarily avoid it; thus indulging in an abusive exercise of its administrative discretion. While the Commission was largely occupied, in its earlier years, with finding qualified licensees and controlling electrical interference, now a new problem has developed, which is just as important as electrical interference and which the Commission must meet and solve. The rapidly increasing number of stations and the resulting competition for advertising as well as program "talent" has just as dangerous possibilities as electrical interference. The public interest requires not merely that a maximum quantity of minimum quality service shall be given. If competition is permitted to develop to that extent, then "the larger and more effective use of radio in the public interest"[53] cannot be achieved.

The method of uncontrolled competition argued for by the Commission in the present case is in fact one way of creating monopolies. If it were allowed to go on unrestrained, according to its theory of non-reviewable arbitrary power, none but a financial monopoly could safely exist and operate in the radio broadcasting field. The Commission justifies its action in the present case, and justifies its contention in theory, by assuming that if a chain, operating several broadcasting stations, or a company which owns both newspapers and broadcasting stations, is able to carry one

---

[52] 60 App.D.C. 92, 94, 48 F.2d 461, 463. See Evangelical Lutheran Synod v. Federal Communications Comm., 70 App.D.C. 270, 105 F.2d 793.

[53] Section 303(g), 47 U.S.C.A. § 303 (g).

of them financially, even though the latter station is not able to support itself, then the latter cannot protest against destructive competition. The result of this policy might well be to destroy or frighten from the radio broadcasting industry, any independent station attempting to operate on its own resources; and to leave in the field only monopolies which were sufficiently supported financially to withstand the destructive competition which might result from arbitrary, careless action upon the part of the Commission in the granting of new station licenses. It was undoubtedly with just such considerations of possible arbitrary administrative action in mind that Congress provided for judicial review under the Communications Act on behalf of any person aggrieved or whose interests are adversely affected; as it likewise did under the Transportation Act. In each instance the remedy is statutory in character, and in each instance designed to protect rights and equities also deriving from statutes in derogation of the common law.[54]

We come then to the next important question, i.e., whether appellant has assigned sufficient reasons of appeal to give this court jurisdiction. The Supreme Court has held that the jurisdiction of a district court is to be " 'determined by the allegations of the bill, and usually if the bill or declaration makes a claim that if well founded is within the jurisdiction of the Court it is within that jurisdiction whether well founded or not.' "[55] Similarly, our jurisdiction on appeal under the Communications Act depends upon whether reasons of appeal are assigned, which, if well founded, would show that the appellant is a person aggrieved or whose interests are adversely affected by the decision of the Commission from which the appeal is taken.[56] If, however, upon an examination of the record we find that the appellant is not a person aggrieved or adversely affected by the order of the Commission, it then becomes our duty to dismiss the appeal. Woodmen of the World Life Ins. Soc. v. Federal Communications Comm., 70 App.D.C. 196, 105 F.2d 75.

We have held that the reasons assigned in the Sanders Brothers case[57] were sufficient to furnish proper grounds of contest on appeal upon the issue of "economic injury to an existing station through the establishment of an additional station." In that case the reasons given showed (1) that the appellant was a licensee under the Act; (2) that it was engaged in the operation of a broadcasting station; (3) that the Commission had granted an application for a competing station license; (4) that the operation of the proposed station would necessarily result in such severe loss of operating revenue as to impair the service rendered by appellant; and (5) destroy its ability to render proper service in the public interest. Such a showing is sufficient to present the issue on appeal.

In the present case the following reasons for appeal were assigned:

1. The Commission erred as a matter of law in failing to find and conclude and on the basis of such conclusion to sustain the claim of appellant (successor to and assignee of protestant before the Commission) that the financial and economic interests of Station WAAB would be adversely affected by the establishment and operation of an additional regional station in Boston.

---

54 Western Pacific California R. Co. v. Southern Pacific Co., 284 U.S. 47, 51, 52 S.Ct. 56, 76 L.Ed. 160; St. Louis Southwestern Ry. Co. v. Missouri Pacific R. Co., 289 U.S. 76, 81–83, 53 S.Ct. 516, 77 L.Ed. 1042. The language of par. 20 of Section 1 of the Transportation Act, 41 Stat. 474, 478, 49 U.S.C.A. § 1(20), is no broader than that of Section 402 (b)(2) of the Communications Act, 48 Stat. 1093, 47 U.S.C.A. § 402(b)(2). Suit may be filed by "any party in interest." See Claiborne-Annapolis Ferry Co. v. United States, 285 U.S. 382, 52 S.Ct. 440, 76 L.Ed. 808; Detroit & M. Ry. v. Boyne City, G. & A. R. R. Co., D.C.E.D Mich., 286 F. 540; Bremner v. Mason City & C. L. R. Co., D.C.D.Del., 48 F. 2d 615.

55 Utah Fuel Co. v. National Bituminous Coal Comm., 306 U.S. 56, 60, 59 S. Ct. 409, 411, 83 L.Ed. 483. See also, Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 105, 53 S.Ct. 549, 77 L.Ed. 1062; Moore v. Chesapeake & Ohio Ry. Co., 291 U.S. 205, 210, 54 S.Ct. 402, 78 L.Ed. 755; South Covington & Cincinnati Street Ry. Co. v. Newport, 259 U. S. 97, 99, 100, 42 S.Ct. 418, 66 L.Ed. 842.

56 Sanders Brothers Radio Station v. Federal Communications Comm., 70 App. D. C. 297, 299, 106 F.2d 321, 323, and cases there cited; Stuart v. Federal Communications Comm., 70 App.D.C. 265, 105 F.2d 788.

57 70 App.D.C. 297, 106 F.2d 321.

2. The conclusion that "the protestants have failed to sustain their respective protests" is arbitrary and capricious on the record as a whole, and specifically so, in holding:

(a) "The protestants have failed to establish facts to show that operation by the applicant, as proposed, would adversely affect their economic interests. There is nothing in the record indicating that the entry of the applicant into the regional field would so affect the economic welfare of the protestants, or any of them, as to have any ultimate effect whatsoever on the public interest, convenience and necessity"; and,

(b) "The charge that the granting of the application under consideration would increase competition wherein the protestants will be involved and will inflict upon them pecuniary loss is mostly a matter of conjecture; and the testimony offered to sustain the charge leaves the prospect so problematic as not to furnish a present substantial basis for the protests made or for any sound judgment based thereon"; and,

(c) "Station WMEX, operating as proposed and the protesting stations in the Boston area operating as at present, would serve to a large extent the same territory; and the protestants contend that if the applicant becomes a regional station and enters into competition with them for regional business, it will adversely affect their economic interests; but the protestants failed to develop any facts sufficient to indicate the extent of the competition that might result from the granting of the application or to show the effect of that competition upon the business of the protestants."

The foregoing statement of reasons fails to present an issue as to whether the anticipated competition will necessarily result in such severe loss of operating revenue as to impair the service rendered by appellant, or whether it will destroy appellant's ability to render proper service in the public interest. It falls far short, therefore, of the reasons which, on the record presented in the Sanders Brothers case, we held to be sufficient. In no event should the statement in the present case be regarded as a model for the future. However, reason numbered 2(a) does at least suggest the issue, and we will con-sider it as sufficient, solely for the purposes of this appeal.[58]

[17, ▮▮▮ The Commission contends, however, that even if destructive economic competition may constitute a sufficient basis for contest on appeal, the appellant has failed to show any such injury in fact. Upon this point the Commission made the following findings, which for convenience we number:

1. "Shepard Broadcasting Company, Inc. (WNAC), Boston, operates on 1230 kilocycles with 1 kilowatt night and 5 kilowatts day; Bay State Broadcasting Corporation (WAAB), Boston, on 1410 kilocycles with 500 watts day and night; Massachusetts Broadcasting Corporation (WCOP), Boston, on 1120 kilocycles with 500 watts daytime only; and WLAC, Inc., Nashville, Tennessee, on 1470 kilocycles with 5 kilowatts, day and night."

2. "Station WMEX, operating as proposed [1470 kilocycles, 5 kilowatts unlimited] and the protesting stations in the Boston area operating as at present, would serve to a large extent the same territory; and the protestants contend that if the applicant becomes a regional station and enters into competition with them for regional business, it will adversely affect their economic interests; but the protestants failed to develop any facts sufficient to indicate the extent of the competition that might result from the granting of the application or to show the effect of that competition upon the business of the protestants."

3. "The Census of Business Radiobroadcasting for Boston (1935) when seven stations were operating, shows that their net sales of time amounted to $1,649,000; that $895,000 were for local service and $754,000 were for national and regional service. Station WMEX is already in the field competing for a part of the radio revenue to be derived therefrom. If it becomes a regional station, it will raise its service rates. (And if a redistribution of regional advertising should occur the reasons therefor would, no doubt, also tend toward a realignment of local advertising.) The protestants have failed to establish facts to show that operation by the applicant, as proposed, would adversely affect their economic interests to any greater extent than operation

---

[58] See Great Western Broadcasting Ass'n v. Federal Communications Comm., 68 App.D.C. 119, 94 F.2d 244; Pulitzer ▮▮▮▮ Pub. Co. v. Federal Communications Comm., 68 App.D.C. 124, 94 F.2d 249.

by the applicant, at present, adversely affects their economic interests. There is nothing in the record indicating that the entry of the applicant into the regional field would so affect the economic welfare of the protestants, or any of them, as to have any ultimate effect whatsoever on the public interest, convenience and necessity."

4. "In the protest of Shepard Broadcasting Service, Inc. (WNAC), it is claimed that if the application is granted, Station WMEX will become a direct competitor of the protestant for advertising patronage as well as a direct competitor for listener audience and attention; that such competition will tend to decrease the income of the protestant or to make it more difficult for protestant to sell time on its station; and that the value of Station WNAC as ·an advertising medium will thus be depreciated."

5. ". . . The protest of Bay State Broadcasting Corporation (WAAB) is similar to that of Shepard Broadcasting Service, Inc."

6. "The protest of the Massachusetts Broadcasting Corporation (WCOP) states that the granting of the application will work an economic hardship on that protestant. The Shepard Broadcasting Service, Inc. filed no statement of profit and loss account. Bay State Broadcasting Corporation filed a statement covering a period of 34 weeks ending on September 26, 1936, and showing a loss of $24,213.22. Massachusetts Broadcasting Corporation introduced a statement covering a period of 7 months ending on January 31, 1937 showing a net loss for the period in the amount of $1,750.19."

7. "The charge that the granting of the application under consideration would increase competition wherein the protestants will be involved and will inflict upon them pecuniary loss is mostly a matter of conjecture; and the testimony offered to sustain the charge leaves the prospect so problematic as not to furnish a present substantial basis for the protests made or for any sound judgment based thereon."

Except for number seven, these findings are sufficient to support the determination of the Commission, adverse to the contention of the appellant. Number seven is ambiguous. Standing alone and read literally it suggests that the Commission was unable to determine the issue presented by appellant and the other protestants. The Supreme Court has said that it is not the duty of a reviewing court to "search the record to ascertain whether, by use of what there may be found, general and ambiguous statements in the report intended to serve as findings may by construction be given a meaning sufficiently definite and certain to constitute a valid basis for the order." [59] That Court has also said, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." [60] The use in finding number seven of language similar to that used by us in WGN, Inc. v. Federal Radio Comm., 62 App.D.C. 385, 68 F.2d 432, cannot excuse its ambiguity and inadequacy. In that case the language was used to indicate the *insufficiency* of a statement of reasons on appeal. However, in view of the clear and unequivocal statements contained in findings two and three, there is sufficient basis for the Commission's determination. In fact, it was only by incorporating and denying those statements, in its reasons for appeal, that appellant succeeded in presenting the issue to us.

Moreover, we are unable to accept appellant's contention that the findings of the Commission are arbitrary and capricious. It is true that the evidence is susceptible of other conclusions than those drawn from it by the Commission; but that is not determinative. Neither is it material that this court might have arrived at other conclusions. As was recently said by the Supreme Court in Rochester Telephone Corp. v. United States, 307 U.S. 125, 145, 146, 59 S.Ct. 754, 764, 83 L.Ed. 1147: "So long as there is warrant in the record for the judgment of the expert body it must stand. * * * Having found that the record permitted the Commission to draw the conclusion that it did, a court travels beyond its province to express concurrence therewith as an original question. 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.'" [61] To hold otherwise would be to

---

[59] Atchison, Topeka & Santa Fe Ry. v. United States, 295 U.S. 193, 201, 55 S.Ct. 748, 752, 79 L.Ed. 1382.

[60] United States v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023.

[61] See also, Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 78 L.Ed. 1260.

substitute the judgment of the court for that of the Commission.[62] The record as a whole reveals a substantial basis both for the Commission's findings and for its determination. This being true they are neither arbitrary nor capricious.

We have carefully examined appellant's other contentions, but in the view we take of the case we find it unnecessary to decide the questions presented therein.

Appeal dismissed.

STEPHENS, Associate Justice, concurs in the result.

---

[62] Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659; Florida v. United States, 292 U.S. 1, 12, 54 S.Ct. 603, 78 L.Ed. 1077; Federal Trade Comm. v. Pacific States Paper Trade Ass'n., 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534; Federal Trade Comm. v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655; National Labor Relations Bd. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 270, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Agwilines, Inc. v. National Labor Relations Bd., 5 Cir., 87 F.2d 146, 151: "It was therefore for the Board, where the evidence offered a reasonable choice, to draw its own inferences and conclusions. If the evidence reasonably admitted of the conclusions they drew, we are bound by them. We may not, by substituting our own conclusions for the ones they drew, reverse theirs unless those conclusions are clearly improper, that is, the evidence affords no reasonable basis for them." See also, Leach v. Carlile, 258 U.S. 138, 140, 42 S.Ct. 227, 66 L.Ed. 511; Farley v. Heininger, 70 App.D.C. 200, 105 F.2d 79, certiorari denied, 60 S.Ct. 110, 84 L. Ed. ——.