NATIONAL BROADCASTING CO., Inc., v. FEDERAL COMMUNICATIONS COMMISSION (MATHESON RADIO CO., Inc., et al., Intervenors).

No. 7933.

United States Court of Appeals for the District of Columbia.

On Reargument Decided Sept. 12, 1942.

Writ of Certiorari Granted Jan. 18, 1943.

See 63 S.Ct. 526, 87 L.Ed. ——.

Mr. D. M. Patrick, with whom Mr. Philip J. Hennessey, Jr., both of Washington, D. C., was on the brief, for appellant.

Mr. Telford Taylor, General Counsel, Federal Communications Commission, with whom Thomas E. Harris, Assistant General Counsel, and Messrs. Harry M. Plotkin and Daniel W. Meyer, all of Washington, D. C., Counsel, were on the brief, for the Federal Communications Commission. Messrs. Charles R. Denny, Jr., and Benedict P. Cottone, both of Washington, D. C., also entered appearances for the Federal Communications Commission.

Mr. W. Theodore Pierson, with whom Mr. Andrew G. Haley, both of Washington, D. C., was on the brief, for Matheson Radio Company, Inc.; Intervenor.

Messrs. Arthur H. Schroeder and Geo. O. Sutton, both of Washington, D. C., filed a brief on behalf of Berks Broadcasting Company, Intervenor.

Before GRONER, Chief Justice, and STEPHENS, MILLER, VINSON, EDGERTON, and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The appeal is from an order of the Commission entered April 7, 1941. The applicant (Matheson Radio Company, Inc.) operates Station WHDH at Boston, Massachusetts, and is intervenor here. Appellant operates Station KOA at Denver, Colorado, upon the same frequency, 830 kc, now 850 kc under the North American Regional Broadcasting Agreement. The order authorized increases in power and time for WHDH. Appellant claims it is aggrieved and its interests are adversely affected by the order. Hence it asserts both a right of appeal and one to hearing by the Commission, which denies both. The principal questions are therefore whether, on the showing made, (1) appellant has standing to appeal; (2) the Commission acted arbitrarily or erroneously in refusing to permit it to intervene as a party in the administrative proceedings.

KOA is a Class I station, operating since 1928 on a clear channel with 50 kw power.[1] By virtue of this classification it was the only station operating on its frequency at night prior to the order now in question. From 1930 WHDH had been a 1 kw station operating daytime only until sunset Denver time. The order modified its license to permit operation for unlimited time and with 5 kw power. No formal or literal modification was made in KOA's license, but modifying the license of WHDH created electrical interference after sunset in KOA's secondary service area. Roughly the region affected is that lying 700 miles or more east of Denver. To accomplish this change, the Commission had to transfer the frequency 850, on which both stations operate, from subdivision (a) to subdivision (b) of Section 3.25 of its rules.[2] Accordingly the order provided for this transfer.

The substantive injury of which appellant complains consisted therefore in creating new and additional electrical interference, affecting its secondary service area; degrading the status of Station KOA from a clear channel station by reclassifying it; and, in effect though not in terms, modifying its license in these respects. As appears below, appellant also asserts these changes not only affected its interests substantially and adversely, but had like effect upon the public interest, in depriving listeners within the secondary service area of its service and also in jeopardizing the status of this frequency under the North American Regional Broadcasting Agreement.[3]

The substantive injuries however, both to appellant and to the public, are set forth primarily not to secure substantive redress in this appeal, but (1) to establish appellant's standing to appeal; and (2) to show that appellant had a right to intervene in the Commission's proceedings of which it has been deprived either arbitrarily or erroneously. The case therefore raises again the troublesome question concerning who is entitled to appeal from the Commission's orders and upon what showing, under the nebulous provisions of the statute in this

[1] Under Sections 3.22 and 3.25 of the Commission's Rules and Regulations, the following. provisions concerning clear channel stations are made:

"§ 3.22 *Classes and power of standard broadcast stations—(a) Class I station.* A 'Class I station' is a dominant station operating on a clear channel and designed to render primary and secondary service over an extended area and at relatively long distances. Its primary service area is free from objectionable interference from other stations on the same and adjacent channels, and its secondary service area free from interference, except from stations on the adjacent channel, and from stations on the same. channel in accordance with the channel designation in § 3.25 or in accordance with the 'Engineering Standards of Allocation' at page 2756. The operating power shall be not less than 10 kw nor more than 50 kw (see also § 3.25 (a) for further power limitation)."

"§ 3.25 *Clear channels; class 1 and II.* The frequencies in the following tabulation are designated as clear channels and assigned for use by the classes of stations as given:

"(a) To each of the channels below there will be assigned one Class I station and there may be assigned one or more Class II stations operating limited time or daytime only: 640, 650, 660, 670, 700, 720, 740, 750, 760, 770, 800, 810, 820, 830, 850, 860, 870, 980, 1,000, 1,070, 1,- 090, 1,130, 1,150, 1,170 and 1,190 kilocycles. The power of the Class I stations on these channels shall not be less than 50 kw.

"(b) To each of the channels below there may be assigned Class I and Class II stations: 680, 710, 790, 970, 1,020, 1,040, 1,050, 1,060, 1,080, 1,100, 1,110, 1,- 140, 1,160, 1,180, 1,460, 1,470, 1,480, and 1,490 kilocycles." Code of Fed.Reg. (Supp. 1939) 2742, 2744.

[2] See note 1 supra. Various contentions made with reference to this change, as being one in policy, "legislative" or "judicial" in character, made upon hearing˙ before an improper official, i. e., an examiner, etc., are not considered herein, since other and more important issues are sufficient to dispose of the appeal.

[3] Par. B, 8(d) of Part II of this treaty provides: "If within the period of this Agreement the country to which a clear channel has been assigned shall have made use of the channel but not in the manner above described or not to the extent required by. the provisions of this Agreement, such country shall be considered as having relinquished that portion of the rights which it has not used and at the expiration of this agreement, the other countries party thereto shall have the right, if they see fit, to withdraw the unused privileges from such country and to reassign them to any or all of the other interested countries."

respect;[4] and the equally difficult, perhaps more unsettled inquiry, who, if anyone, may intervene as of right in its proceedings for granting, denying or modifying a license under the equally cloudy provisions relating to these matters.

## I.   The Right to Appeal

Appellant has standing to appeal. The statute confers this upon a "person aggrieved or whose interests are adversely affected." Section 402 (b) (2). In Federal Communications Comm. v. Sanders Brothers Radio Station, 1940, 309 U.S. 470, 642, 60 S.Ct. 693, 698, 84 L.Ed. 869, 1037, the Supreme Court held that the licensee of a competing station likely to be financially injured qualifies for appeal. It went further and asserted that Congress *"may have been* of opinion that one likely to be *financially* injured by the issue of a license would be the *only* person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission in granting the license." (Italics supplied.) "Financially" was inserted by amendment of the opinion after the decision was first handed down. It does not follow that this guarded and speculative dictum makes economic injury the sole criterion of status to appeal, as the Commission and WHDH contend. The Sanders case involved on its facts only financial injury. The court held that sufficient. Though it suggested the possible insufficiency of other kinds of injury, no question concerning them was before it. The decision therefore cannot be taken as deciding such an issue.

There are strong reasons why the dictum should not be accepted as either stating or forecasting the law. Nothing in the statute specifies or requires a showing of financial injury as the exclusive basis to appeal. Nor are the hypotheses tenable that such injury is the only sort, of a substantial kind, likely to occur or that only persons financially hurt will be able or likely to appeal. It is true they probably will have the financial resources necessary for litigation. It does not follow that others, who may be affected adversely though not financially, will be neither willing nor able to appeal.

The contrary assumption ignores the facts that radio broadcasting is not exclusively a matter of business or financial gain, and that it is the public interest, not the private right, which is primarily at stake upon the appeal. Unfortunately, commercial enterprise has taken over the lion's share of the field. Unfortunately, because, when radio was in its infancy, many persons hoped that much of its work would be done by educational, religious and eleemosynary institutions, more than the event has permitted. Notwithstanding the policy which has so favored commercial operators, there is a considerable volume of noncommercial broadcasting. It takes place through stations supported not by advertising or "plugs," but by churches, universities, colleges, charitable foundations and others who have no profit-making revenues. Many still hope that the evils apparently inherent in commercial broadcasting yet may bring about a larger allocation of frequencies to licensees whose objects are not primarily the making of money.

Limiting appeals to persons financially injured would have the practical effect of denying them to nonprofit-seeking broadcasters. Conceivably, in very rare instances, such operators could show financial injury. But obviously they could not do so in the circumstances in which commercial stations are able most frequently to demonstrate its possible incidence. The view cannot be accepted that these stations can appeal only when some action of the Commission has the practical effect of destroying their capital investment. Such a view would not be consistent with the public interest and right which is the foundation

---

[4] The question has been presented here and in the Supreme Court in numerous cases. E. g., Sanders Bros. Radio Station v. Federal Communications Comm., 1939, 70 App.D.C. 297, 106 F.2d 321, reversed on other grounds, 1940, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037; WOKO, Inc., v. Federal Communications Comm., 1940, 71 App.D.C. 228, 109 F.2d 665; Yankee Network, Inc., v. Federal Communications Comm., 1939, 71 App.D.C. 11, 107 F.2d 212; Stuart v. Federal Communications Comm., 1939, 70 App.D.C. 265, 105 F.2d 788; Pittsburgh Radio Supply House v. Federal Communications Comm., 1938, 69 App. D.C. 22, 98 F.2d 303; Red River Broadcasting Co. v. Federal Communications Comm., 1938, 69 App.D.C. 1, 98 F.2d 282, certiorari denied, 1938, 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400; Pulitzer Pub. Co. v. Federal Communications Comm., 1937, 68 App.D.C. 124, 94 F.2d 249.

of all broadcasting and which primarily the commercial broadcaster's appeal is designed to protect. Federal Communications Comm. v. Sanders Bros. Radio Station, supra. The latter is likely to utilize the public interest as a vehicle for protecting his private standing, however tentative that may be in legal status. Few business institutions rush to the defense of the public weal when they are not affected in any private way. As between such operators, therefore, and the noncommercial broadcaster, the latter cannot be held a knight unworthy, unable or unwilling to battle for the general good in the lists of appellate litigation. Congress had no intention to exclude nonprofit stations from taking appeals, either absolutely or in practical effect. And if they can appeal by showing other than financial injury, so also can commercial operators.

Absence of economic injury however does not amount to presence of other sufficient injury. Appellant asserts it is enough that the order creates electrical interference. This the Commission now denies, in reversal of its apparent position prior to the Sanders decision.[5] Appellant argues that electrical interference, regardless of amount or effect, creates the right of appeal. To support this it points out that the whole occasion for regulation, including the feature of license, arises from the limited number of frequencies and the chaos electrical interference would cause, indeed did cause,[6] if there were no authority vested with power of license, allocation and police.

It is not necessary, however, to go so far with appellant. In the present stage of radio, very few changes, either in frequency or in power, can be made without creating some degree of electrical interference. This may range from minute and practically harmless interruption with remote and very occasional listeners in sec-

ondary service areas to total obliteration in the primary field. Notwithstanding the Commission's apparently contrary view,[7] the latter effect would appear to be more than sufficient for appeal, whether or not a showing of financial injury could be made. Likewise, at the other end, it seems doubtful that an infinitesimal amount of new electrical interference should create standing to appeal.

Presumably by the decision in the Sanders case the Supreme Court intended that the financial injury must be something more than nominal or highly speculative. It seems not unreasonable to read the opinion as requiring by implication that there be probable injury of a substantial character. So much by way of limitation seems necessary to prevent vindication of the public interest from turning into mass appeals by the industry at large, with resulting hopeless clogging of the administrative process by judicial review. Likewise, with electrical interference, it is hardly necessary to secure appellate championship by every broadcaster who may be affected in only a remote and insubstantial manner. It follows that electrical interference, without a showing of financial injury, may be sufficient to create standing to appeal. But for this purpose there must be a reasonable possibility that it will be substantial. And this must appear, as we have held, from the notice of appeal and statement of reasons. Yankee Network, Inc., v. Federal Communications Comm., 1939, 71 App.D.C. 11, 107 F.2d 212.

In this case the notice sufficiently discloses appealable interest. It states that appellant is aggrieved and its interests are adversely affected by the order and by its reaffirmance on denial of appellant's petition for rehearing; sets forth in detail the nature and steps of the proceedings before the Commission; and states, among reasons relied upon, that the order:

---

[5] The controversy in that case, and previously, concerning Section 402(b) (2) was with reference to whether financial injury was sufficient, it being apparently the Commission's position that injury from electrical interference was the most that Congress had in mind in enacting this section.

[6] Prior to the Radio Act of 1927 and following the decision in United States v. Zenith Radio Corp., D.C.N.D.Ill.1926, 12 F.2d 614, and the Attorney General's opinion, Ops. Att'y Gen. (1926) 126. See Monograph of the Attorney General's Committee on Administration Procedure,

Part 3, Federal Communications Commission (1940) 83.

[7] The Commission's position that only financial injury, whether or not resulting from electrical interference, is sufficient for appeal necessarily means that electrical interference without financial injury, regardless of the extent or effect of the interference, would be no basis for appeal. Generally, of course, extensive interference would cause financial injury. But it is not clear this would be true of nonprofit stations or necessarily, perhaps, always in other cases.

"(a) Results in *a substantial* modification of the license held by appellant \* \* \* without having afforded it an opportunity to be heard as required by Section 312 (b) of the Communications Act of 1934." (Italics supplied)

"(b) Results in a change in the class and character of the frequency \* \* \* without consent or hearing as required by Section 303 (f)."

"(c) Results in a degradation of service on 830 kc (850 kc) which will be prejudicial to the priority rights of the United States on this channel under Paragraph B 8 (d) of Part II of the North American Regional Broadcasting Agreement without affording appellant an opportunity to be heard on its own behalf and on behalf of the listeners it serves."

"(d) Results in a discrimination against service to rural listeners in order to furnish additional service to the residents of the City of Boston and as such is violative of the requirements of Section 307 (b) of the Communications Act of 1934."

Other assigned reasons include assertedly improper procedures in changing Commission policy, failure to return the application as required by its rules, amendment of the rules under improper notice, insufficiency of the evidence to support the decision, denial of hearing according to due process of law, etc.

On its face, therefore, the notice charges that the order substantially modified the license of KOA, changed the class and character of its frequency, degraded the station's service under the North American Agreement; jeopardized thereby not only appellant's rights but the priority rights of the United States and therefore the interests, present and future, of the listening public, and created discrimination against rural and in favor of urban listeners contrary to statutory requirements. These reasons appear to be a sufficient showing of both private and public interest and of adverse affectation to sustain the appeal. They require that it be considered on the merits, that is, on the question whether appellant was wrongfully refused a hearing before the Commission.

## II. The Right to Hearing

■ The extent of the conflict concerning intervention appears from the extreme positions taken by appellant, on the one hand, that such a right arises from the Fifth Amendment as a matter of due process of law, and by the Commission and WHDH, on the other, that Congress has given the former an absolute discretion which nothing in the Constitution inhibits or limits.

It is said that existence of a right of appeal presupposes a right to intervene. The statute does not expressly so provide. But in view of our conclusion, for reasons to be stated, that appellant was entitled to intervene, it is not necessary to decide whether in some unusual circumstance one not entitled to become a party might appeal.

On the other hand, the Commission's argument is untenable that appellant has no right to be heard because it has no vested right in the frequency, or in its license or status thereunder, Federal Communications Comm. v. Sanders Bros. Radio Station, supra, or because the statute empowers the Commission to make rules and regulations, Section 154 (i), and to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." Section 154 (j). The fallacy is that one who has no such vested right has therefore no procedural protections in relation to the more tenuous rights, privileges or status he possesses.[8] Whatever its proper label, "qualified right," "privilege," "status," "licensee," appellant acquired something of value by virtue of its license and the statute. The label is not important. The fact that appellant has fulfilled statutory conditions and has received statutory advantages, status and protections is important. Tutun v. United States, 1926, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738. That it may be deprived of these and that the Commission has discretion to take them away, wholly or in part, do not mean that it can do so in an unfair manner or without hearing.[9] The protections of procedural due process do not disappear because the substantive right affected is not a full-grown vested right like that in one's castle at the common law. The right of appeal in capital criminal cases is entirely statutory. But that does not put it entirely beyond constitutional limitation. Cf. Boykin v. Huff, 1941, 73 App.D.C. 378, 121 F.2d 865, and authorities cited. Similarly, though statu-

[8] See Davis, The Requirement of Opportunity to be Heard in the Administrative Process (1942) 52 Yale L.J. 1093, 1118–25, and authorities cited and discussed therein.

[9] Ibid.

tory rights in the nature of occupational license, revocable in administrative discretion, may not be "property" for purposes of protections afforded by substantive due process, they are not unguarded against arbitrary administrative action.[10] Procedural due process protects them against this, and does so notwithstanding the broad rule-making power and discretion given the Commission concerning the manner of conducting its business.

The crucial issue therefore comes down to whether appellant has been deprived of an opportunity for a fair hearing to which it was entitled either by the statute or by elementary due process. The two prongs of the question may be considered togeth-

er. It will aid first to set forth the statutory provisions concerning hearing and those provided by the Commission's Rules and Regulations which are pertinent both to hearing and to intervention. These then may be considered in the light of what was done by appellant and the Commission.

### A. The Statutory Provisions and Scheme of Hearings

Provisions concerning hearings are contained in Sections 303 (f), 309 (a), 312 (a), (b), and 409 (a) of the Act,[11] in addition to Section 154(i), (j) referred to above.

Section 309 (a) relates to applications for license, for renewal and for modification. The Commission is authorized to is-

---

10 Ibid.

11 48 Stat. 1082, 1085, 1086, 1087, 1096 (1934), 47 U.S.C. §§ 303(f), 309(a), 312 (a), (b), 409(a) (1941).

§ 303(f). "Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: Provided, however, That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless, after a public hearing, the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with."

§ 309(a). "If upon examination of any application for a station license or for the renewal or modification of a station license the Commission shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. In the event the Commission upon examination of any such application does not reach such decision with respect thereto, it shall notify the applicant thereof, shall fix and give notice of a time and place for hearing thereon, and shall afford such applicant an opportunity to be heard under such rules and regulations as it may prescribe."

§ 312(a). "Any station license may be revoked for false statements either in the application or in the statement of fact which may be required by section 308 hereof, or because of conditions revealed by such statements of fact as may be required from time to time which would warrant the Commission in refusing to grant a license on an original applica-

tion, or for failure to operate substantially as set forth in the license, or for violation of or failure to observe any of the restrictions and conditions of this chapter or of any regulation of the Commission authorized by this chapter or by a treaty ratified by the United States: Provided, however, That no such order of revocation shall take effect until fifteen days' notice in writing thereof, stating the cause for the proposed revocation, has been given to the licensee. Such licensee may make written application to the Commission at any time within said fifteen days for a hearing upon such order, and upon the filing of such written application said order of revocation shall stand suspended until the conclusion of the hearing conducted under such rules as the Commission may prescribe. Upon the conclusion of said hearing the Commission may affirm, modify, or revoke said order of revocation."

§ 312(b). "Any station license after June 19, 1934, granted under the provisions of this chapter or the construction permit required hereby and after such date issued, may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter or of any treaty ratified by the United States will be more fully complied with: Provided, however, That no such order of modification shall become final until the holder of such outstanding license or permit shall have been notified in writing of the proposed action and the grounds or reasons therefor and shall have been given reasonable opportunity to show cause why such an order of modification should not issue."

§ 409(a). "Any member or examiner of the Commission, or the director of

sue, renew or modify the license if, *upon examination of the application,* it determines that public interest, convenience or necessity would be served by *granting* it. If it does not reach *such* a decision on examining the application, then it must set the matter for hearing, "notify *the applicant * * * and * * * afford such applicant* an opportunity to be heard under such rules and regulations as it may prescribe." (Italics supplied.)

Under Section 303 (f) the Commission is authorized to "make such regulations *not inconsistent with law* as it may deem necessary to prevent interference between stations and to carry out the provisions of this Act [chapter]," but with the proviso that *"changes in the frequencies, authorized power, or in the times of operation* of any station, shall not be made without the consent of *the station licensee* unless, *after a public hearing,* the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this Act [chapter] will be more fully complied with * * *." (Italics supplied.) These are the most important provisions presently involved.

Section 312 (a), (b) requires hearing with notice to the station licensee when revocation or modification of license is proposed. In the case of modification the licensee is to be "given reasonable opportunity to show cause" why the order should not issue, after having notice in writing.

By Section 409 (a) a commissioner or examiner or the director of a division is empowered, when designated by the Commission, to hold hearings, except an examiner may not do so in administration of Title III with respect to a matter involving: "(1) a change of policy by the Commission, (2) the revocation of a station license, (3) new devices or developments in radio, or (4) a new kind of use of frequencies. In all cases heard by an examiner the Commission shall hear *oral arguments* on request *of either party.*" (Italics supplied.)

As has been noted, Section 154 (i), (j) confers broad power upon the Commission to make rules and regulations, issue lawful orders and determine the manner of conducting its business.

Before turning to the regulations we may note that Section 309(a) does not *in terms* guarantee an applicant or anyone else a hearing in all cases. The matter may be determined upon examination of the application, if in that manner the Commission is able to conclude that the application should be *granted.* In other words, the applicant is not entitled to a hearing if the action is to be in his favor. On the other hand, if the Commission cannot decide for him by merely examining the application, it must afford *him* a hearing with due notice. In short, it cannot deny the application without a hearing and the applicant is a necessary party. Whether other persons who may be affected, including existing licensees, are or may be entitled to a hearing is not determined explicitly or perhaps implicitly by this section. It is primarily an applicants' section and deals chiefly, though not necessarily exclusively, with applicants' rights.

Section 312(a) (revocation), (b) (modification), on the other hand, deals primarily with rights of existing licensees. Hearing on notice is prescribed. When the question is modification *the licensee* must be given "reasonable opportunity to show cause" why the order should not issue. When it is revocation the hearing is to be "conducted under such rules as the Commission may prescribe." In contrast with Section 309(a), Section 312 deals expressly and therefore primarily, not with applicants and their rights, but with licensees and their rights. Under the one applicants cannot be affected adversely without a hearing; under the other licensees cannot be so affected by revoking or modifying the license without a hearing. Neither section purports to make the hearing provided ex parte or to limit it in the one case to applicants, in the other to licensees. But neither purports to bring in others or give them a right to come in. Though others are not expressly excluded, the theory seems to be in each in-

---

any division, when duly designated by the Commission for such purpose, may hold hearings, sign and issue subpenas, administer oaths, examine witnesses, and receive evidence at any place in the United States designated by the Commission; except that in the administration of sections 301–362 of this title an examiner may not be authorized to exercise such

powers with respect to a matter involving (1) a change of policy by the Commission, (2) the revocation of a station license, (3) new devices or developments in radio, or (4) a new kind of use of frequencies. In all cases heard by an examiner the Commission shall hear oral arguments on request of either party."

stance that the hearing is principally, though not necessarily exclusively, for the benefit of the applicant in the one case, of the licensee in the other. Neither section is designed on its face explicitly to take care of the situation where the interests of an applicant and an existing licensee or of two licensees clash or may do so.

Section 303(f) is in terms, particularly of the proviso, much like Section 312(a), (b), in that it provides expressly for public hearing concerning "changes in the frequencies, authorized power, or * * * times of operation," unless "the station licensee" consents to the change. It is not stated explicitly that he is entitled to notice and participation in the hearing, but that seems clearly implied from the provision for hearing and prohibition of these changes without it unless he consents. Furthermore, the section contains no explicit statement concerning notice to or participation by any other person. On its face therefore the provisions of Section 303(f) concerning hearing and the licensee's participation are much like those of Section 312(b) dealing with modification, though in terms they are not entirely identical.[12] In a broad sense both may be said to deal with modification and both to require hearing, unless the licensee affected consents to the change. This is true, notwithstanding Section 303(f) in its principal grant of authority is, as is noted later, primarily a rule-making or "legislative" section, and the proviso is in one aspect a limitation upon the Commission's rule-making power.

But to regard Section 303(f) as merely a duplicate or alternative provision to Section 312(b), for protection of the licensee when his license is to be modified adversely, would make it practically superfluous. This would also ignore the primary clause and purpose of Section 303(f), as well as the differences in express terms of the two sections.[13] The proviso is merely an incident or a limitation of the main provision, which is a grant of power to the Commission to "make such regulations *not inconsistent with law* as it may deem necessary *to prevent interference* between stations and to carry out the provisions of this Act [chapter]." (Italics supplied.) The principal concern of the section is interference, and the limitations of the proviso, including the requirement of hearing, relate to matters most likely to cause and most directly related to interference. In contrast with Sections 309 (a) and 312(b), which are primarily one-party sections, Section 303(f) deals with subject matter which necessarily involves at least two private parties in addition to the Commission, with the principal occasion for difference and dispute between or among them, namely, interference, and with the chief causes of this. The section is therefore basically a two-party or multiple-party section, not counting the Commission. This is true notwithstanding the primary clause is cast in terms of delegating rule-making power to the Commission concerning the subject matter. It is nevertheless multiple-party subject matter. The parties affected may be two or more existing stations, or they may be one or more such stations and an applicant or applicants for license. The section does not literally designate others than "the station licensee". But it necessarily contemplates, from the very nature of the subject matter, that others similarly situated will be similarly affected, and the only persons who may be so affected are other licensees and applicants.

In my judgment this fact is of paramount importance, for determining both what is meant by "changes in the frequencies, authorized power, * * * times of operation" and the nature and character of the hearing required, each a matter in fundamental dispute here. Conceding, as I think we may, that Sections 309(a) and 312 (b) are primarily one-party sections, that is, they involve ordinarily one party in addition to the Commission itself, and the hearings they provide are chiefly, though not necessarily exclusively, for determining matters in the first instance between the Commission and an applicant in the one case and it and a licensee under prospect of having the

---

[12] Section 312(b) is cast in terms of notice and "to show cause," specifying that notice be given the operator whose license is to be modified. Section 303(f) has no express provision for notice and merely requires "public hearing" when "the station licensee" does not consent to the proposed change. Section 303(f) also deals only with "changes in the frequencies, authorized power, or * * * times of operation," not broadly with *modification* of station *license*, as does Section 312(b). Section 303(f) is not limited in terms to changes made *in the license* itself, while Section 312(b) is so limited in its terms.

[13] See note 11 supra, and circa note 12 supra.

terms of his license changed in the other, Section 303(f) is from the outset no such one-sided matter. It is essentially one which from the start raises issues affecting not only the Commission, but also other persons who as among themselves are opposed in interest. The conflict is not, even in the initial stage, merely Commission-applicant, as in Section 309(a), or Commission-licensee, as in Section 312(b). It is Commission-licensee-applicant or Commission-licensee-licensee. It is three-way, and it may turn out to be adverse three ways.

In my opinion this paramount fact makes the hearing provided by Section 303(f) an essentially different kind of hearing or stage in hearing from those provided and required by Sections 309(a) and 312(b). In the first place, it differentiates that hearing from the one provided by Section 312(b) and prevents it from becoming a mere duplicate or alternative of the latter. If their issues, purposes and application were identical, there would be no need for two such explicit, and to some extent inconsistent, provisions for hearing. The mere fact that the modifications which might be involved in the hearing under Section 312(b) are broader and more inclusive than those specified in Section 303(f) does not explain the duplicate provision, since the latter includes the most important respects in which modification might be required under Section 312(b). But beyond this, the two sections have or are likely to have entirely different consequences. Many of the modifications which may be proposed under Section 312(b) relate to matters affecting only the Commission and the particular licensee, in other words, do not affect other licensees or applicants. They involve such things as equipment, observance of regulations in broadcasting, etc., essentially Commission-licensee issues and only such. Hence, in these cases, there would be no need for giving notice and right to participate to other persons. Consequently provision for such notice and participation was not included and the Section provides these protections only for the person necessarily and ordinarily affected, the licensee faced with possible modification of the terms of his license. It does not exclude others, but it gives them no right to come in at this stage. The Commission may permit them to do so

in its discretion. But it is not required to admit them until it becomes apparent their rights also may be affected.

It would be a very strange thing, however, for Congress to insist upon notice and hearing when the issues lie merely between the Commission and one party, whether applicant or licensee, and to ignore entirely or fail to make similar provision in the much more highly controversial three-party situation. It would be even more strange for it to guarantee these safeguards to one of the parties in the latter situation, as against both the Commission and the other party interested, but deny it to the latter or leave his right to be heard entirely within the Commission's unlimited discretion, especially when he is or may be the only one adversely affected. In my opinion Congress did neither. Framing Sections 309(a) and 312 primarily for one-way conflicts, it left the more complex multiple-party situation to be dealt with by Section 303(f). And in doing so, while it gave the Commission large discretion and rule-making power, it provided specifically for public hearing upon proposed changes relating to the most important causes of interference and of conflict and dispute between licensees or between them and applicants. This section therefore is distinguishable from Sections 309(a) and 312(b), in necessarily bringing together from the start the private parties with clashing interests, as well as the Commission with which each may be at odds, and in providing a hearing for disposition of these issues. Congress, in providing for this hearing, did not intend only one of the affected parties to have notice and be heard.[14]

The section is not aptly drawn, particularly in the language which provides for the hearing. But only superficial reading would lead to the conclusion that only one of the interested parties is given right to a hearing. Literally read, the section merely requires a hearing if the changes specified are to be made "without the consent of the station licensee." There is no provision, as there is in Sections 309(a) and 312(a), (b), for notice or for any specified person to be heard. As has been said, it is only by implication from the condition of "the station licensee's" failure to consent to the proposed change that his protections in these

---

[14] This view derives some support also from the provisions of Section 409(a), note 11 supra, that "In all cases heard by an examiner the Commission *shall* hear oral arguments on request *of either party*," explicitly recognizing the right of more than one person to be a party. (Italics supplied.)

respects can be found within the section's terms. So much, however, is necessary, unless the "public hearing" is to be one at which no one but the Commission would have the right to appear and participate.

What is more important, the section does not in terms identify the "station licensee" whose consent is required if hearing is dispensed with and who, by implication, is entitled to hearing if he does not consent. Presumably, though by inference, he is or may be the licensee in the terms of whose license some change is proposed. But the section does not say this explicitly. In this respect also it differs in terms from Section 312(b). The latter relates expressly to modification of "station license," and prohibits making the order until "the holder of such outstanding license" is given notice and hearing. No such explicit terms appear in Section 303(f). It nowhere mentions "station license" or "modification" of license. It does refer to "station licensee," but in no way, except by possible implication, does it identify him as the "holder of such outstanding license" which is to be "modified" in terms, or exclude the licensee whose operations may be more seriously affected, even destroyed, by favorable changes made in another operator's license. In short, section 303(f) is drawn in different terms and, in my opinion, for different purposes, from Section 312(a), (b). Literally the hearing provision relates to "changes in the frequencies, authorized power, or \* \* \* times of operation," not to "modification" of outstanding licenses. Literally also it requires the consent "of the station licensee," if the change is made without hearing, and hearing if such consent is not given. But it does not specify whether the licensee is one in the terms of whose license a change is to be made or one only affected by a change made in another's license or by granting a new application. This further narrows the crucial issue.

The Commission asserts the only person entitled to hearing under Section 303(f) is the station licensee in whose license the change is made. Hence, in its view, KOA had no right under the section to be heard, since there was no change in its license and it continued free to operate on the same frequency, power and time after WHDH's application was granted as before. This view is presented with vigor and combatted with equal force. Much of the argument revolved pedantically about the difference between "in" and "of," that is, whether "change *in* frequency" means "change *of* frequency," as if the two forms might not mean the same thing and that as well what the one as what the other asserts. The controlling principles of construction are greater than prepositional hairsplittings.

The Commission's interpretation, though possible upon the language, would ignore the fundamental character of the subject matter and of the controversies as well as the conflict of interests; make the section's provision for hearing one-sided; exclude one of the private parties interested and, in some instances, as in this case, the only one adversely affected; make the section a merely narrower duplicate of Section 312 (b), without taking account of their differences in terms, purposes and ordinarily applicable situations; and, finally, so construed, there would be serious question concerning the section's validity. That construction would create the incongruous situation that an applicant for a license and a licensee facing literal "modification" would be entitled by the terms of the Act to hearing before adverse action, but a licensee equally or more seriously "affected" by the granting of another's application or changing another's license favorably would have no right to be heard except in the Commission's discretion. Logically this would be true, notwithstanding the interference thus created might blot out the "affected" station's operations. In this view a commercial station could wipe out a nonprofit one completely by licensed interference and, under the Commission's argument that financial injury is the only basis for appeal, the latter would have no right to be heard before either the Commission or the courts. If the injured station were also a commercial one and could show financial injury, it could appeal, but would have no right to be heard before the Commission. If it could not show financial injury, it would be in the same boat with the nonprofit station.

Such a construction would run contrary to the policy of every other provision for hearing in the Act. Not only in Section 303 (f) itself, but in Sections 309(a) and 312 (a), (b), the statute dispenses with hearing when the action to be taken is *favorable* to the person, whether applicant or licensee, whose interests are directly and immediately involved. It is zealous to provide for hearing when the decision is or may be adverse to him. Yet, in this situation, KOA is the only station adversely affected. The

action is favorable to WHDH. It was merely an applicant. KOA was an existing station. As between the two, if either was entitled to the greater protection, it would seem to be KOA. If the action taken or proposed had been adverse to WHDH, it had a statutory right to hearing, and in fact the Commission respected it. Yet when it reached the point of proposed decision in WHDH's favor and adverse to KOA, it denied that the latter had any right to hearing, whether statutory or constitutional. This perverts the hearing policy of the Act. That is to dispense with hearing when decision is favorable to the one affected, to require it when it is adverse. Section 303 (f) is no exception. It does not specify in terms who shall be heard or have notice. But it provides for public hearing when the "station licensee" does not consent to the proposed change in frequency, power or time. It does not say "the licensee whose license is modified in terms." Unquestionably it includes him. But he is amply protected by Section 312(b). Whether he or the other station or stations affected will be injured depends, not on the mere fact his license is altered, but on *how* it is changed, whether favorably to him or to the others. The Commission's view posits the right to hearing, not upon the question who is hurt or likely to be hurt, as do the other sections, but upon whose letter of license is altered or likely to be changed. It ignores realities, effects and consequences in favor of the formal and literal nature of the change. "The letter killeth; the spirit keepeth alive." Section 303(f) does not in terms exclude the station licensee who is injured by changes favorable to other licensees or applicants. Such licensees may be the only persons injured or adversely affected by the action. In such a case (and this is one), to posit hearing upon the want of consent of the licensee in whose favor the decision is made would be to deprive the only person injured or capable of being injured, and through him the public he serves, of the right to be heard. Such a view would pervert the section into an instrument for suppressing all protest by the only person hurt or likely to be hurt, except possibly as he might raise his voice on appeal, and then only, in the Commission's view, to be met with the answer that he has no right to be heard before it. It would suppress also representation of the public interest which it is the primary purpose of the statute to protect and secure.

In my judgment therefore Section 303(f) cannot be given the narrow construction, merely duplicating the function and purpose of Section 312(b), for which the Commission and WHDH contend. In addition to its obvious injustice, contradiction of the statute's general hearing policy, failure to take account of the differences of the two sections in language, subject matter and character of the controversies dealt with, the Commission's view refuses to recognize that the fact of interference rather than mere literal change in the terms of a license is what causes harm and chaos to stations affected, to the industry, and to the public. If accepted, it would also raise serious question concerning the section's validity, both for want of essential minima of procedural due process in some opportunity to be heard as of right and for want of essential fair play in favoring one interested party unduly as against another. Neither preservation of the public interest nor of the Commission's broad power and discretion to conduct its functions in disposing of the public's business requires acceptance of an interpretation so doubtful and unfair.

The foregoing views necessarily contemplate that the hearing provided by Section 303(f), under the proviso, has in such an application as this "quasi-judicial" rather than merely "legislative" effect. That is true, in my opinion, notwithstanding the Section's principal grant of power is to make rules. In such an application as this, the making of rules relating to the defined changes necessarily affects existing rights by changing them, and that is as true as if the change were made by order rather than by rule. When such an effect is achieved, whether by the one form of action or the other, the ordinary distinction between "quasi-legislative" and "quasi-judicial" action gives way before the elementary requirement that rights be not destroyed or impaired without hearing. The proviso requires hearing whether the change is in form "legislative" or "judicial."

## B. The Regulations and Their Application

It remains to consider whether the regulations, as they have been applied, have violated appellant's right to a hearing. The construction given above to Section 303(f) does not mean that every licensee who may be in some way, however minutely or remotely, affected by the change or who may consider or surmise that he will be affected,

is entitled to a hearing or that the hearing must be a full-panoplied judicial proceeding. Further questions therefore are: (1) What interest or injury must an affected licensee have, and how must this be disclosed, in order for him to assert the right to hearing; (2) what is meant by hearing; (3) when does the right arise and when may it properly be asserted?

Interference may affect only a few stations or many. With frequencies crowded as they are, a change in the frequency, power or time of one station may affect dozens, possibly hundreds of others, some seriously, some only slightly. Expedition of the Commission's functions requires that hearings not become radio conventions or interminable trials like some receivership proceedings. There must therefore be some limit to the number of persons entitled to participate as parties and to the extent to which those so entitled may take part.

Apart from applicants and licensees faced with modification or revocation of license, the statute makes no express provision for determining who may be necessary parties, whether by right of intervention or as persons entitled to notice and party status from the inception of the hearing. With the two stated exceptions, the Commission has treated the matter as one of intervention under rules prescribing the basis upon which "affected" stations and others may come in. Under its former regulation, Rule 105.19, Rules and Regulations (1935), disclosure of "a substantial interest in the subject matter" was sufficient. This proved unsatisfactory[15] and has been revised to add the requirement that the petition also show "the facts on which the petitioner bases his claim that his intervention will be in the public interest." Rules and Regulations (1939), Section 1.102.

The two regulations are alike in excluding persons who cannot show substantial interest. There would seem to be no valid objection to this. Participation as parties of persons only insubstantially or remotely interested or affected is not necessary for protection of either private right or public interest. Exclusion of such persons from participation as of right is necessary for efficient conduct of the Commission's functions and to keep the hearings within manageable bounds.

Affirmatively, however, the two rules operate differently. The practical effect of the old one (Rule 105.19) was that affected licensees became parties upon disclosing in the petition "substantial interest in the subject matter." Upon this showing, intervention became a matter of right. So effective, the rule may be taken as having complied with the implicit requirements of Section 303(f). Red River Broadcasting Co. v. Federal Communications Comm., 1938, 69 App.D.C. 1, 98 F.2d 262. Persons substantially affected by action proposed under that section had the right to come in. That it was exercised nominally as a process of intervention, by filing a petition showing the nature of their interest, rather than by receiving notice and being regarded as parties from the outset, was no more than a reasonable concession to the Commission's difficulty of ascertaining in advance who might be sufficiently interested and of confining the hearing within reasonable bounds. Red River Broadcasting Co. v. Federal Communications Comm., supra.

The new rule (Section 1.102), however, excludes persons substantially interested, including existing licensees "affected," unless the petition states facts to show their "intervention will be in the public interest." The intended purpose was to cut down the number participating under the old rule.[16] The language of the new requirement is ambiguous. If by it were meant that the intervenor must show that the public interest is tied up substantially with his private one, so that in the hearing he would be champion for both, perhaps the analogy to the conditions necessary for appeal, as stated in the Sanders case, would sustain the further limitation.

The rule, however, has not been so applied. The Commission has not interpreted it as calling merely for a statement of specific facts to show that the public interest is involved in the petitioner's operations, will be affected substantially and adversely by the change proposed, and consequently that the petitioner's participation will be in championship of both its own and the public interest. Rather, as counsel have stated the matter in the brief, the decisions denying appellant's right to intervene were "not based on appellant's lack of interest. The Commission held that whether or not

[15] See Monograph of the Attorney General's Committee on Administrative Procedure, Part 3, Federal Communications Commission (1940) 16ff., Gellhorn, Administrative Law—Cases and Comments (1940) 511.

[16] Ibid.

appellant had a sufficient interest, it should not be permitted to intervene because it failed to show *how its participation in the hearing* would be *of any assistance in the determination of the issues involved.*" Referring to the practice under the former rule (Rule 105.19), it is also said that procedure "was abolished because it made impossible an efficient administration of the Act." And again, "It thus became apparent that interest alone was an insufficient test for intervention * * *. Virtually every application involves many persons who claim to be interested. * * * Most such applications are for facilities in a community which already has one o'r more stations which may be fearful of the petition * * * or are for facilities which cause electrical interference to existing stations. In many situations both factors combine to increase the number of potentially interested persons * * *. In practically every instance the persons who claim interest in the proceedings are existing licensees whose private interests are promoted by protracted proceedings which delay as long as possible the establishment of competing facilities. In view of these facts there is no wonder that the old intervention rule did not conduce 'to the proper dispatch of business and to the ends of justice.' "

So applied, the rule comes down at best to one of efficiency, without controlling regard to interest, public or private, or how far it may be affected; at worst to one of mere convenience to the Commission in performing its functions. That this is the meaning and effect of the rule, as it has been applied, appears not only from the argument and the briefs, but also from the Commission's key decision in support of this policy, In re Application of Hazelwood, Inc. (Docket 5698), from the undue reliance placed in argument upon the breadth of the Commission's discretion and rule-making power, and from the action taken in this case.

A rule which posits the basic right of hearing exclusively upon mere convenience to the Commission or whether the petitioner's participation "will be of assistance to it in determining the issues," leaving this to be determined solely in its discretion, is not reasonable. It is a denial of any right to hearing. That it may be inconvenient or time-consuming for such a body to hear persons substantially interested and affect-

ed, or that, in the Commission's exclusive discretion, they may not be able to aid it, furnishes no basis for refusal to hear their side of the case, whether on the facts or on the law. Efficiency is not to be bought at such a price to essential fairness. Cf. Brandeis, J., dissenting in Myers v. United States, 1926, 272 U.S. 52, 240, 47 S.Ct. 21, 71 L.Ed. 160. If therefore the rule has been applied to appellant in this manner and with this effect, it has cause for complaint. Whether it has been so applied and with such consequence is the remaining question.

Upon that the facts are important, as are also the questions whether appellant disclosed its own and the public interest and the affectation of both sufficiently. Involved also is the question of what kind of hearing appellant was entitled to have.

In my opinion there was no improper denial of hearing prior to the denial of the second petition for intervention filed December 16, 1940, when the Commission gave notice to KOA and others of its *proposed findings and conclusions* favorable to granting WHDH's application. Until then it was wholly possible the application, filed under Section 309(a), would be denied. Until that time the proceeding was, as has been pointed out, essentially a one-way matter, involving questions primarily and initially between the applicant and the Commission. It had been unable to decide from the application in favor of the applicant. Accordingly, as the section required, it put the matter down for hearing and notified WHDH. It also gave notice to others who might be affected, including KOA, though the section did not in terms require this. Appellant then petitioned for intervention and the petition was denied, as were a petition to review this action and a motion by appellant to dismiss the application on the ground it did not conform to the rules. In none of this was there abuse of the Commission's powers or discretion or violation of appellant's statutory or constitutional rights. In this initial stage the burden was upon the applicant to convince the Commission prima facie that granting its application would be in the public interest. The very fact the matter was set for hearing was a tentative indication the decision would be adverse to the applicant.[17] WHDH had therefore the laboring oar. Unless and until it convinced the Commission there was apparently valid ground, at

---

[17] Monograph of the Attorney General's Committee on Administrative Procedure, Part 3, Federal Communications Commission (1940) 13.

least a prima facie case, for granting the application, no harm was done or could be done to other stations. Hence, until it appeared from this initial stage of the total administrative process that some harm to KOA and others similarly situated possibly or probably would result, there was no essential reason either in due process or in the provisions of Sections 309 (a) and 303 (f) for bringing them in. Until then the Commission was entitled in its discretion, as Section 309(a) contemplated, to treat the matter as one exclusively between itself and the applicant. So much by way of concession, not only to the terms and the general scheme of the statute, but also to efficiency in performing the Commission's functions, is reasonable.

Concomitant with this view of the statute, however, is the requirement that the conclusions of law and fact reached by the Commission in the initial stage, concerning issues which might affect other parties substantially, should be tentative, not final and conclusive, if they were favorable to the applicant. This, in fact, appears to have been observed, since the findings and conclusions were issued as "proposed," not as final and decisive, and notice concerning the proposed action was given to affected persons.

At this point, however, the clash between the interests of KOA and WHDH, and their respective public constituencies, became apparent, with the possibility of the latter's success. WHDH had succeeded in discharging its initial burden. The necessary effect of action in its favor would be to create electrical interference with KOA and also to require its reclassification under the Commission's rules. At this stage, then, the matter had become one no longer primarily between WHDH and the Commission, but one primarily between them, on the one hand, and KOA and other stations adversely affected, on the other. Though the process initiated under Section 309(a) would not become final and complete until conclusive decision had been made, the provisions of Section 303(f) then first came compellingly into play, overlapping the final phase of the proceedings under Section 309 (a), and required that persons substantially and adversely affected by the proposed decision be given opportunity to present their side of the case.

At this point appellant filed its second petition for intervention, which was denied January 7, 1941. However, the order permitted it to file a brief amicus curiae. It did so and participated in this character in the oral argument upon the question of adopting the proposed findings. On March 27, 1941, the proposed findings and conclusions were adopted by a vote of three to two, with two Commissioners not participating. The members voting in the negative filed a vigorous dissenting opinion. 1941, 8 F.C.C.Rep. ———. The decision became effective by formal order April 7, 1941. Appellant's petition for rehearing was then denied and this appeal followed.

In the final and decisive stage of the Commission's action, therefore, appellant was excluded as a party, notwithstanding it was permitted to file a brief and appear in oral argument as amicus curiae. Unless these concessions gave it all to which it was entitled by way of hearing, the exclusion cannot stand as justified. This is because the basis on which it was made was not valid. It is not necessary to regard Section 1.102 as invalid, since, it may be possible to apply it with valid effect. However, the manner in which it has been applied generally and in this case is invalid, as being contrary both to Section 303(f) of the Act and possibly also to elementary fair play required by due process.

Conceding appellant's interest, its substantial character, not denying its substantial relation to the public interest or that this as well as appellant's private interest might be adversely affected by the order, the Commission refused to recognize appellant as a party on the ground its petition did not disclose facts to show how its participation in the proceedings would be helpful to or would assist the Commission in deciding the issues. It then belied this action by announcing in the order of denial that appellant might file a brief as amicus curiae.

In view of the basis for the Commission's action, it is perhaps not necessary to inquire whether the petition, under some other rule or some other interpretation of the present one, would be sufficient. It was denied for an invalid reason, and that in itself is error sufficient to require reversal, unless its effects were cured by allowing appellant to appear as amicus curiae.

The petition, however, more than complied with the rule, apart from the invalid interpretation. It set forth petitioner's interest as a dominant clear channel station on the frequency 830 kc, with freedom from interference at night; that granting

WHDH's application would cause electrical interference; require change in classification of KOA's frequency under the Commission's rules; result in degradation of service on frequency 830 kc prejudicial to the priority rights of the United States under the North American Regional Broadcast Agreement; discriminate against service to rural listeners and in favor of urban ones already well served; and stated other reasons not necessary to repeat. This admittedly was sufficient to show the substantial character of petitioner's interest, and in addition its substantial relation to the public interest, including service to rural areas, possible discrimination against them in favor of urban regions, and possible injury to the nation's priority rights under the international treaty, together with possible or probable substantial injury both to appellant privately and to the public interest. So much appearing, the petition complied in every respect with Section 1.102, except the construction that "intervention will be of assistance to the Commission in its own judgment" or "will be convenient for the Commission." The petition therefore complied with the rule in all its valid aspects, and should have been granted.

The Commission argues, however, that appellant was accorded in substance its full right to hearing, notwithstanding it was excluded as a party, because, first, it was allowed to file a brief and to appear in oral argument as amicus curiae; and, second, under Rule 1.195 appellant had, but failed to exercise, the right to present such evidence as it might choose to submit. Rule 1.195 provides for maintaining in the office of the secretary a record of all communications received relating to the merits of any application, together with the names and addresses of the senders. When the date for hearing is set, the secretary is required to notify these persons that they will have opportunity to appear and give evidence. Under the rule they are not precluded "from giving any relevant and competent testimony" because they lack "a sufficient interest to justify * * * intervention as a party. * * *" In view of these things the Commission says appellant had, but waived, full opportunity to present evidence, and had also full opportunity for argument, oral and written, upon the legal issues—thus, in effect, to appear upon both the facts and the law. It asserts therefore that appellant

actually was deprived of no substantial right. This presents the final refinement of the issue.

Appellant claims too much. The petition, among other things, sought to "reopen the proceeding in order to afford petitioner an opportunity to introduce evidence, to cross-examine all witnesses, and otherwise participate fully in the proceedings; upon such record file proposed findings of fact and conclusions of law; have the right to file exceptions to any proposed Commission decision thereafter issued; request oral argument upon such proposed decisions and upon its exceptions thereto; in all respects participate fully in the important issues involved in the application" of WHDH. In short, appellant sought not only to participate as a party in the final and crucial stage of the process under Section 303(f), but also to reopen, repeat and participate in the initial stage under Section 309(a) as fully as would a party in judicial proceedings in equity with the rights to present evidence, cross-examine witnesses, including all who had been heard previously, take exceptions, submit findings, take part in argument, etc. Such a view of the proceedings would convert them essentially into a judicial trial in the final stage for reexamination de novo, so far as appellant might demand, of issues and matters presented in the initial one. In my judgment no such extensive right of participation is contemplated by Section 303(f) or any other section, or is required by due process, and to enforce it would pervert the statutory scheme, convert the requirement of fair administrative hearing into one for a judicial procedure, and bring about a clogging of the Commission's work and functions inconsistent with their nature, complexity and due performance.

Both the Commission and appellant therefore have gone too far in their positions. On the one hand, appellant's right to hearing is not conditioned absolutely in the Commission's discretion, as it would be if limited to participation in argument as amicus curiae and in presenting facts under the provisions of Rule 1.195, applicable to all members of the public. Its right to participate is to do so as a matter of right, not of grace, and as a party. That is true, notwithstanding the extent of participation allowed as a matter of grace or discretion may be substantially or nearly identical with what the party is entitled

to have as a matter of right. On the other hand, appellant is not entitled to a full-dress judicial proceeding or to dictate the extent of its participation, without regard to reasonable limitations which may be imposed by the Commission to achieve orderly and not unduly extended hearings. Some middle ground therefore must mark out the boundary between appellant's right and the Commission's power.

It would be enough to dispose of the appeal that appellant was excluded from appearing as a matter of right and allowed limited participation as a matter of grace. But to do this, without more, would leave the further proceedings in doubt. Two problems must be distinguished, one the determination of appellant's right to participate, the other the extent of that right. The former is not a matter of discretion with the Commission. One in appellant's position must be heard upon issues such as this proceeding involved in the final stage, under Section 303(f). But that right is not inconsistent with the Commission's requiring its existence to be shown by something more than mere general allegations that the holder is substantially interested, will be substantially affected, and that the public interest is involved and will be likewise affected. If this were all that could be required, practically everyone affected in any way, immediately or remotely, substantially or slightly, could come in at his option by alleging these generalities. On the other hand, it is not necessary to set forth the evidence which would be presented on the merits, nor would requiring this be reasonable. Between these two extremes a middle ground may be found to enable the Commission to determine that the interest and the injury, public and private, are substantial and real rather than insubstantial or visionary, and are substantially related. Perhaps an analogy can be taken from judicial proceedings in which findings of fact are required, in the distinctions which involve evidentiary facts, basic facts and ultimate facts.[18] There could be no undue limitation of the right to appear in requiring existence of the ultimate facts on which it is posited to be shown by statement of such basic facts, so that the Commission might be guided by something more than the vacuis-

tic formulae of "substantial interest," "adversely affected," etc. So much at least would seem to be properly conceded, not to the Commission's discretion, but to the necessity that it be enabled to distinguish with reasonable certainty between persons entitled to come in as of right and others not so entitled but claiming this status on grounds insufficient once the actual facts of their situation become apparent. If at times there may be difficulty, as there is in judicial proceedings, in determining what are basic as distinguished from merely evidentiary facts, reasonable latitude toward including some of the more important of the latter will resolve it. The error if any should be made upon the side of stating more rather than less than may be actually necessary.

The other problem, involving the extent of the right to participate, is properly within the Commission's discretion under its broad rule-making power, reasonably exercised, beyond a few essential minima required by elementary notions of fair play. Neither the statute nor the Fifth Amendment prescribes specifically what these minima are. Nor has it been made clear by judicial decision what constitutes a minimum compliance with due process in the way of administrative hearing. Presumably this will vary to a considerable extent with the nature of the substantive right, the character and complexity of the issues, the kinds of evidence and factual material,[19] the particular body or official, and the administrative functions involved in the hearing. In other words, essential fairness of hearing bears some relation to these factors, but beyond certain, though very few, basic requirements which may be common to all fair hearings, the extent of participation by parties and others is a matter for regulation by statute or properly conferred rule-making authority.

The Communications Commission deals with highly technical and complex engineering and economic functions and relations, a highly organized and crowded industry serving primarily a public interest, but strongly affected with private incentive. Its functions are both regulatory and quasi-judicial. Its action in a single case often affects many persons, station

[18] Saginaw Broadcasting Co. v. Federal Communications Comm., 1938, 68 App.D. C. 282, 96 F.2d 554.

[19] See Davis, The Requirement of Opportunity to be Heard in the Administrative Process (1942) 51 Yale L.J. 1093, 1106, 1117.

licensees and others. Its hearings therefore tend to be many-party ones, in which each one appearing seeks as large a participation as possible. Often certain issues affect some, but not other parties. Yet once a party has come in, his tendency is to have a hand in all that goes on. Cross-examination especially lends itself to abuse in such a situation.[20] So does the opportunity to present expert testimony.[21] Consequently, in contrast with the fundamental right to come in, to be present as a party and be heard, much in the way of discretion must be conceded to the Commission in controlling the extent to which parties may be allowed to participate. The Commission's objective of keeping the hearings within manageable bounds is to be achieved, therefore, not as has been attempted by excluding persons who rightfully should come in, but by controlling through reasonable regulation the extent to which they may take part. As to this the Commission has and rightfully may exercise much authority in various specific ways.

The essential minima for fair hearing would seem to include a reasonable opportunity to present evidence concerning disputed issues of fact and argument upon issues of law affecting the party tendering them, and to do both as a party to the proceeding, not merely in the character of one present on sufferance or favor. In neither respect however does this mean, as appellant seems to think, that a party may require retracing all steps taken before the stage at which his right to come in arises or that he may wander throughout the record upon issues affecting other parties, but not himself substantially.[22] In this case, therefore, it does not mean, as appellant assumed, that it could require the entire proceedings prior to the time of its proper intervention to be reopened with right on its part to cross-examine all witnesses heard in the preliminary stage under Section 309(a) and, apparently, in its discretion to compel reproduction of all testimony then produced. Such a view would force the Commission to incur the waste of holding the preliminary hearing upon the application under Section 309(a) and then repeating all that had been done in it when it becomes apparent, from the proposed determination favorable to the applicant, that the final stage of hearing under Section 303(f) must be gone through with in order to afford one in appellant's position his opportunity to be heard.

The statute contemplates no such wasteful process, and in my opinion due process does not require it. Adequate protection for appellant's rights can be secured without this, and in full consonance with the statutory scheme. It contemplates, as has been said, a preliminary hearing in which only the applicant is required to be present as a private party. It may become final, if the decision is adverse to him. If so, others affected will not be harmed, and their presence in this stage would only clutter the proceedings and the record. If not, then appellant's right to hearing arises under Section 303(f). But nothing in the act or in the Constitution requires this to be entirely de novo. It is enough that it be adequate.[23] At the proper stage of intervention, the record in the preliminary hearing has been made. It may be made available to the intervenor. From the multiplicity of evidence and of issues it is not unfair to require him to specify, at least in a general way, the issues he proposes to meet, the evidence he wishes to contradict, and other matters concerning which he wishes to raise objection. This should be done with particularity, not merely by broadside charge against the entire previous proceedings. With the issues so self-limited, it will then be for the Commission to determine whether, in the exercise of its quasi-judicial discretion, the intervenor's participation should be further limited, in relation to the production of evidence, cross-examination, argu-

[20] Id. at 1103. Monograph, op. cit. supra note 17, at 16, 17.

[21] Particularly when the agency has a body of technical experts, such as the Commission's engineering staff, competent to give disinterested expert opinion upon the technical issues or questions. See Monograph, op. cit. supra note 17, at 19.

[22] This seems implicit in the well-recognized rule that due process requirements are satisfied if at any time before governmental action becomes final, hearings are allowed either by administrative or judicial action, and therefore persons not directly or immediately affected in the initial stages of a hearing which involve primarily the interests of others may be excluded until a later phase when their interests become directly and immediately involved. See Davis, op. cit. supra note 19, at 1104, 1136–40, and authorities cited; Monograph, op. cit., supra note 17, at 20.

[23] Ibid.

ment or other normal incidents of hearing. In this manner each party may be restricted fairly to the issues and participation pertinent to his case, rather than allowed to roam through the entire proceedings upon matters relevant to others, but not to himself or matters concerning which he has no objection. Perhaps a considerable part of such confinement may be accomplished by the issuance of appropriate general regulations. But whether by that method or by action in the particular case, the result may be achieved of affording the intervenor fair and adequate hearing, without at the same time permitting him to run away with the hearing, nullify all that has gone before the intervention, or unduly extend the hearing beyond what fair protection of his rights and the public interest may require.

It is not necessary to extend the discussion further. Appellant has shown sufficiently its right to come in. It should have been allowed to do so, as a party to the proceeding, not merely as a friend of the Commission or a member of the public. That is true, notwithstanding the extent of participation actually allowed may have been substantially all that a party was entitled to have, though by this statement it is not intimated that this was true. That question need not be determined. It is one thing to be present as a party, and as a matter of right. It is another to appear upon favor or by sufferance. It is still another to be heard in a particular fashion or at a particular time or stage.

Appellant's right arose, not when the preliminary proceedings upon the application were begun nor when the matter was set for hearing, nor thereafter prior to issuance of the "Proposed Findings of Fact and Conclusions"; but when these were issued. At that time, upon the showing made in appellant's petition, it should have been recognized as a party and allowed to participate thereafter on that basis.[24]

The extent of its right to participate, however, was largely within the discretion of the Commission, having due regard to the principles above stated. Appellant was not entitled as a matter of right to

all of the relief demanded in its second petition to intervene or in the petition for rehearing, and upon another hearing may be required, in the Commission's reasonably exercised discretion, to confine itself as has been indicated, and to point out with reasonable particularity the portions and features of the previous proceedings it wishes to challenge.

This does not amount, in substance or effect, to acceptance of the Commission's view that appellant can be excluded for failure to set forth facts to show that its intervention will be of assistance to the Commission in deciding the issues. That factor is pertinent to the question how far appellant may participate, though perhaps not conclusive of it. It is not the criterion of the right to be heard. It may, in fact, have exactly the opposite effect, that is, the intervention may present facts or legal argument, contrary to those tentatively accepted by the Commission, which will make its decision more difficult. That is one purpose of hearing. Nor does this view posit the right to be present and to take part upon an exercise of the Commission's discretion or favor. With that right established, every other has protection, and if there is violation by some attempted exercise of discretion in any other respect it may be corrected, first by argument before the Commission itself, or if it is not corrected there, then by appeal.

Without attempting therefore to blueprint the procedure to be followed with respect to the extent of appellant's participation in another hearing, we may leave such matters to the Commission's judgment, where they properly belong, subject only to compliance with the basic requirements of fair play and adequate opportunity to be heard.

For the error in excluding appellant from participation as a party in the final and controversial stage of the proceeding, contrary to the requirement of Section 303(f) of the Act, the order must be reversed, with directions to afford appellant opportunity for hearing in accordance with the provisions of that section.

Reversed and remanded.

---

24 This statement is not intended as meaning that adequate hearing might not have been afforded at a later stage, by appropriate ·regulation, as upon petition for rehearing. Cf. United States v. Illinois Central Ry., 1934, 291 U.S. 457, 54

S.Ct. 471, 78 L.Ed. 909 ; Comment, Necessity for Hearing Before Enforcing Order of Interstate Commerce Commission (1934) 43 Yale L.J. 1300 ; Davis, op. cit. supra note 19, at 1136-40.

GRONER, C. J., and VINSON, J. (concurring).

Judges GRONER and VINSON concur in the conclusion of Judge RUTLEDGE that appellant has not only a right to appeal to this court under Section 402(b) (2) of the Act, 47 U.S.C.A. § 402(b) (2), but also the right to intervene in the proceeding before the Commission. We are, therefore, in agreement with Judge RUTLEDGE that the case should be reversed and remanded for further hearing.

In view of the importance of the principles involved, we consider it desirable, however, to set out in a word our separate views as to the meaning and effect of those Sections of the Act upon which we all agree the decision must turn.

We are in agreement with Judge RUTLEDGE that under Section 303(f), 47 U.S.C.A. § 303(f), the Commission should have accorded appellant the right to participate in the hearing as a party. But we are also of opinion that, since in the facts of this case it is apparent that the granting of the application of the Matheson Radio Company, Inc., operators of Station WHDH at Boston, would result in what amounts, if substance be regarded rather than form, to a modification of appellant's license, Section 312(b) of the Act, 47 U.S.C.A. § 312(b), also provides a right of participation by appellant in the proceedings under that application. While the question is no longer material here— since we assume that, in the present state of the record, the Commission will reopen the proceedings and permit the intervention of appellant as a party—we express our disagreement with the view of Judge RUTLEDGE that the Commission, in its discretion, may exclude appellant from participation until after the proposed findings of fact have been made. It is our view that participation in the hearing, under either Section 303(f) or Section 312(b), should have been accorded both to appellant and to Matheson Company from the outset. It is true that Section 309(a), 47 U.S.C.A. § 309(a), appears to contemplate that if upon examination of an application for a station license, or the renewal or modification thereof, the Commission shall make a determination in favor of the application, it need not accord a hearing to the applicant. But we think, whatever the effect otherwise of this section may be, it is inapplicable in the facts of this case.

Here the application of Matheson Company for an extension of its facilities is in effect an application, as we have said, the granting of which will, if substance be regarded, modify the license of appellant. In the circumstances, we think Section 312(b) is applicable and that both appellant and the Matheson Company were entitled to participate in the proceedings as parties and with the rights of parties. We think the statute contemplates that a licensee's right, although limited and defeasible, shall not be modified or destroyed without a hearing. To allow a hearing only after proposed findings of fact have been made is to deprive appellant of participation during the crucial period of the proceeding—that is, when the evidence is being taken and the record being made up. Appellant's interest existed from the beginning, and it is not enough that that interest was considered by the Commission. It is axiomatic that one whose rights will be affected, not only may himself engage in their protection, but must do so affirmatively and at every step in the proceedings—or take the consequences of his default. Red River Broadcasting Co. v. Federal Communications Commission, 69 App. D.C. 1, 98 F.2d 282. There was no default in this case.

STEPHENS, Associate Justice (concurring).

I concur in the conclusion of Judge Rutledge that the appellant has not only the right to appeal to this court under § 402(b) (2) of the Communications Act, 47 U.S.C.A. § 402(b) (2), but that it had also the right to intervene in the proceeding before the Commission, and I am therefore in agreement with Judge Rutledge that the order should be reversed and the case remanded for further hearing. I am also in agreement with the views and conclusions expressed by Judges Groner and Vinson in their separate opinion. I desire to add the following:

I am aware that the provisions in the Communications Act for hearings speak *in terms* of licenses and rights which are undergoing alteration, suspension or revocation through direct action of the Commission thereon, and not *in terms* of the rights of existing licensees—such as those of the appellant—which will be impaired by the direct action of the Commission in

extending the facilities of another licensee. But I think that by clear implication the safeguards of the Act operate for the benefit of such a licensee as the appellant. For it cannot be doubted that the modification—in the instant case the extension of facilities—of one license right may have the consequence of impairing, or even of destroying, the business of another licensee; this in practical effect is a modification or revocation of his license. A contrary view would regard form rather than substance. That the granting of new or additional station rights may have the consequence of impairing or destroying the business of an existing licensee is recognized in Federal Communications Commission v. Sanders Bros. Radio Station, 1940, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869, 1037, where the Supreme Court, after stating that it is not the purpose of the Act to protect a licensee against competition but to protect the public, that Congress intended to leave competition in the business of broadcasting, stated also:

"This is not to say that the question of competition between a proposed station and one operating under an existing license is to be entirely disregarded by the Commission, and, indeed, the Commission's practice shows that it does not disregard that question. It may have a vital and important bearing upon the ability of the applicant adequately to serve his public; it may indicate that both stations—the existing and the proposed—will go under, with the result that a portion of the listening public will be left without adequate service; it may indicate that, by a division of the field, both stations will be compelled to render inadequate service. . . ." 309 U.S. 475, 476, 60 S.Ct. 698, 84 L.Ed. 869, 1037.

It is true that in the Sanders case the statement is made that the policy of the Act is that no person is to have "anything in the nature of a property right as a result of the granting of a license." But the opinion in that case also recognizes that station licensees may be financially injured by the issue of a license to a competing station. The language first quoted must be read in connection with the opinion as a whole and in connection with the utterances of the Supreme Court in Federal Communications Commission v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656, and Federal Radio Commission v. Nelson Bros. Co., 1933, 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406. In the Pottsville case the Court said: "To be sure, the laws under which these [administrative] agencies operate prescribe the fundamentals of fair play. They require that interested parties be afforded an opportunity for hearing." In the Nelson Bros. case the Court said: "Whether the Commission applies the legislative standards validly set up, whether it acts within the authority conferred or goes beyond it, whether its proceedings satisfy the pertinent demands of due process, whether, in short, there is compliance with the legal requirements which fix the province of the Commission and govern its action, are appropriate questions for judicial decision." In view of the Pottsville and Nelson Bros. cases, and in view of the provisions of the Communications Act which recognize rights, limited in time and quality by the terms of the licenses issued, in station licensees (see especially §§ 301, 309(b) (1), (2), 319(b), 47 U.S.C.A. §§ 301, 309(b) (1, 2), 319(b), I think it clear that a station license issued under the Communications Act for a definite term for the conduct of a broadcasting business requiring substantial investment is more than a mere privilege or gratuity. Whether or not it may be technically called a property right, it is a thing of value to the person to whom it is issued and a business conducted under it may be the subject of injury. I think the Supreme Court in the Sanders case in its reference to the absence of "anything in the nature of a property right as a result of the granting of a license" was using the term property right in the sense of a right absolute or indefeasible. It is clear of course that under the Communications Act a station licensee's rights are subject to modification, or even to revocation, in the public interest. But I do not think the Sanders decision was intended to be taken as meaning that no right even of a limited and defeasible nature exists in a licensee. Nor do I think that the decision was intended to mean that an existing broadcasting station and the investment therein may be injured or destroyed by the introduction of competition or through the extension or modification of the facilities of other licensees *without a hearing before the Commission on the question whether the public interest, convenience and neces-*

*sity will be served by such injury or destruction.*

Even if the Communications Act were doubtful in its recognition of the existence of rights in licensees and in its provision for hearings upon the question whether the public interest requires the reduction or destruction of such rights, I think it would be the duty of the courts to construe the Act as recognizing such rights and providing for such hearings—and this for two reasons. First, in the absence of indubitably clear language requiring such a conclusion, it would be unthinkable to conclude that the Congress would provide for the granting of station licenses for radio broadcasting contemplating, in connection with operating a station, investment in building space and equipment, the hiring of talent, the contracting for advertising, and the employment of labor, but at the same time fail to recognize that by whatever technical name they might be called, whether property rights or license rights, interests would arise, in the persons to whom licenses were granted, which should as a matter of fair play not be impaired or destroyed by the Communications Commission without a hearing upon the question whether the public interest would be served by their impairment or destruction. Right to a hearing before injury by the government in the public interest is one of the fundamental decencies guaranteed by democratic institutions. It is the safeguard of the Anglo-American legal system against arbitrary or capricious action by public authorities. No purpose should be attributed to Congress to deny such a right. Second, to construe doubtful language of Congress as permitting the impairment or destruction of a licensee's interests without a hearing would be to invalidate, under the due process clause of the Fifth Amendment, the action of Congress. That that clause protects against the arbitrary impairment or destruction of substantial rights even though they are limited by the public interest, is not open to doubt. Cf. Northern Cedar Co. v. French, 1924, 131 Wash. 394, 230 P. 837.

MILLER, Associate Justice (dissenting).

I find no substantial allegation of injury in any of appellant's reasons for appeal.

Surely it is not enough, to secure standing to appeal on the basis of affectation of interest or aggrievement, that electrical interference will occur beyond that previously occurring. Surely some injury, actual or anticipated, should be the minimum requirement. And if injury has occurred or is threatened, what other test or measure of its substantiality could there be than that it is financial?

In the Sanders case the Supreme Court said: "Congress had some purpose in enacting section 402(b) (2). It may have been of opinion that one likely to be *financially* injured by the issue of a license would be the *only person having a sufficient interest* to bring to the attention of the appellate court errors of law in the action of the Commission in granting the license."[1] [Italics supplied.] Of course, stated as it is in speculative form concerning legislative purpose, it is possible to argue that this language was not intended to say that *only* a person likely to be *financially* injured has a sufficient interest, within the meaning of Section 402(b) (2). But I think that is exactly what the Supreme Court intended to say. As the Commission in its brief points out, the word financially, which I have italicized, was added after the opinion was first released.[2]

While intangibles such as prestige, or position, in the broadcasting world may seem valuable to a licensee, still they are unimportant—in view of that free competition which Congress intended should exist in the field of broadcasting—unless injury to them would result in financial injury. If, for example, loss of prestige should result in loss of advertising then, perhaps, a tangible injured interest would appear which would give standing to appeal. But if there is no interest, of such character, that it will reveal itself in terms of financial injury, then there is no sufficient interest to give standing to appeal.

This is true even of a licensee which is operating on a nonprofit basis, a college, a church, or a benevolent institution. Financial backing is required to maintain such a licensee. If the injury threatened, endangers that financial backing then the licensee may have standing to appeal; otherwise not. Where else could the line be

---

[1] Federal Communications Comm. v. Sanders Brothers Radio Station, 309 U. S. 470, 477, 642, 60 S.Ct. 693, 698, 84 L.Ed. 869, 1037.

[2] See Federal Communications Comm. v. Sanders Brothers Radio Station, 309 U.S. 642, 60 S.Ct. 693, 84 L.Ed. 1037.

drawn? Would it be sufficient that a Methodist organization was aggrieved by hearing Baptist doctrine preached in the same listening area; or that one college should be disturbed by the songs and cheers of a rival institution of learning?

It is apparent in the present case, therefore, that unless electrical interference was likely to result in financial injury appellant was not an aggrieved or affected person within the meaning of the statute. And if financial injury was likely to result, the licensee could have spelled out that fact in his reasons for appeal. It imposes no undue burden upon one who seeks judicial review of the Commission's decision, to require that he specify clearly, unequivocally, precisely, the nature of his alleged injury. This, appellant has failed to do.[3] Consequently, I would dismiss the appeal.

EDGERTON, Associate Justice (dissenting).

I think that "person aggrieved or whose interests are adversely affected" contemplates a substantial injury as distinguished from a trifling or negligible one. I should suppose that interference *might* affect reception of KOA's signal so adversely, and over so large and important an area, as to cause substantial injury and give appellant standing to appeal, whether or not it caused financial loss. But interference is an elastic term; it may be of any degree. Some interference is minimal and practically harmless. Appellant's notice of appeal, though it alleges "substantial modification" of its license, alleges neither substantial injury nor any facts which constitute substantial injury. It alleges nothing more injurious than "interference to KOA in areas where KOA's signal is now interference free." This allegation would be supported if it were shown that in some small area, thousands of miles from Denver, and of no actual or potential importance to appellant, a few listeners could and did at rare intervals get, without interference, a feeble

signal from KOA, and that their reception of that signal would be made a little worse by WHDH's modification. I think such an allegation would not show standing to appeal. Since appellant's actual allegation may mean no more, we can accept it as showing standing to appeal only if we waive the rule that pleadings are to be construed against the pleader.

If we take that step, I think we should affirm. I find nothing in the Communications Act which required the Commission to give appellant a hearing; quite the contrary. Yet the Commission gave appellant a hearing. It violated neither the Act nor due process.

The Commission was asked to and did modify the license of WHDH. Sec. 309 (a) of the Communications Act provides in effect that the Commission may grant, though it may not deny, an application for modification without a hearing. Most modifications of licenses affect other licensees, and Congress might easily have required that other licensees who stand to lose be given a hearing. It did not. So far as the Act is concerned, therefore, no hearing was necessary. True, Sec. 303(f) requires that the licensee of a station be given a hearing if the Commission is to change that station's "frequencies, authorized power, or * * * times of operation." But that section is not applicable here, since neither the frequency, the power, nor the time of KOA, appellant's station, is being changed. Similarly, Sec. 312(b) forbids "modification" of a license without opportunity to the licensee to show cause why the license should not be modified; but that section is not applicable, since appellant's license is not being modified in any particular.[1] Its license merely authorized it to operate with specified equipment, frequency, power, and time, and still authorizes it to operate with the same equipment, frequency, power, and time. To say that appellant's frequency or its license is being "changed" or "modified"

---

[3] Stuart v. Federal Communications Comm., 70 App.D.C. 265, 267, 105 F.2d 788, 790; Perkins v. Lukens Steel Co., 310 U.S. 113, 125, 60 S.Ct. 869, 876, 84 L.Ed. 1108: "Nor can respondents vindicate any general interest which the public may have in the construction of the Act by the Secretary and which must be left to the political process. Respondents, to have standing in court, must

show an injury or threat to a particular right of their own, as distinguished from the public's interest in the administration of the law."

[1] Sec. 303, including (f), deals in a summary way with the "powers and duties of Commission." Sec. 312, including (b), deals in a detailed way with "revocation and modification" of licenses and with "notice and hearing."

seems to me an inapposite figure of speech. It is true that the Commission's rules, until they were changed in the course of these proceedings, stated that only one Class I station "will be assigned" to the frequency of 850 kilocycles. But that statement of the Commission's purpose or policy was not incorporated, or referred to, in appellant's license. Therefore the license cannot, unless by a most liberal construction, be regarded as intended to make any exclusive grant to appellant, whether of equipment, frequency, power, or time. Appellant's license is no more exclusive in respect to frequency, power, and time than in respect to equipment. And the settled rule requires not a liberal but a strict construction of franchises and licenses.[2] Moreover, Section 301 of the Act provides that "no * * * license shall be construed to create any right, beyond the terms, conditions, and periods of the license," and the Supreme Court has said: "The policy of the Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license. Licenses are limited to a maximum of three years' duration, may be revoked, and need not be renewed. Thus the channels presently occupied remain free for a new assignment to another licensee in the interest of the listening public."[3]

The Constitution does not, in my opinion, give appellant a right to a full hearing, of the trial type, in the proceedings before the Commission. In the absence of statute, licensing authorities are usually under no duty to give any sort of hearing to license holders before changing rules which affect the value of licenses.[4] Appel-

lant's case is somewhat similar to that of a licensed automobile operator who should demand that he be given a hearing before the speed limits are reduced. It is stronger in one respect; for appellant is, and the particular automobile operator is not, more likely than anyone else to be affected by the change proposed. But it is weaker in another respect; for appellant is not, and the automobile operator is, forbidden to do after the change what he was free to do before the change. Only the consequences of appellant's activities, and not the activities themselves, are affected by the change which the Commission has made in the license of WHDH. Appellant is in substantially the same position as the owner of a licensed garage or liquor store who is subjected to new competition by the licensing of a similar business nearer his own than would have been possible under the regulations which were in force when his own license was issued.

It may be that appellant was, as a matter of due process, entitled to some sort of hearing. The Commission's proceedings had a fact-finding aspect, and were more likely to affect appellant's interests than those of any other person. But appellant was not entitled to a hearing which should include "the incidents of a trial in court."[5] Persons may be "heard" without being "permitted to intervene, and thus become parties."[6] Appellant was entitled to no more than a hearing reasonably adequate to protect its interests and reasonably practicable for the Commission and the public; in other words, to a fair opportunity to bring its facts and arguments to the Commission's attention.[7] It had such a hearing—whether of right or of grace we need

[2] Detroit United Railway v. City of Detroit, 229 U.S. 39, 33 S.Ct. 697, 57 L.Ed. 1056; Piedmont Power & Light Co. v. Town of Graham, 253 U.S. 193, 40 S.Ct. 453, 64 L.Ed. 855.

[3] Federal Communications Comm. v. Sanders Bros. Radio Station, 309 U.S. 470, 475, 642, 60 S.Ct. 693, 697, 84 L. Ed. 869, 1037.

[4] Cf. Lacquer & Chemical Corp. v. Mills, D.C.E.D.N.Y., 22 F.2d 697; affirmed 2 Cir., 22 F.2d 700; certiorari denied 276 U.S. 617, 48 S.Ct. 212, 72 L. Ed. 733.

[5] Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 316, 317, 53 S.Ct. 350, 358, 77 L.Ed. 796.

[6] Chicago Junction Case, 264 U.S. 258, 268, 44 S.Ct. 317, 320, 68 L.Ed. 667. "The 'hearing' is the hearing of evidence and argument." Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288.

[7] When an importer has contested the valuation of his goods by the customs service, and exercises his right to have them valued by appraisers, the question "is not to be tried before the appraisers as if it were an issue in a suit in a judicial tribunal." Auffmordt v. Hedden, 137 U.S. 310, 323, 11 S.Ct. 103, 106, 34 L. Ed. 674. If he "is afforded such notice and hearing as enables him to give his views and make his contention in respect of the value of his goods, he cannot complain." Origet v. Hedden, 155 U.S. 228, 238, 15 S.Ct. 92, 96, 39 L.Ed. 130.

not inquire. Pursuant to the Commission's Rule 1.195, it was given an opportunity to appear and present evidence. It chose not to do so. It was permitted to, and did, file a brief and make oral argument. Nothing more was required. It was not formally a party, and some aspects of a trial at law, including opportunity for cross-examination, may have been absent. To rule, as the majority of the court in effect do, that the Commission's action was therefore, erroneous, is to cramp the administrative process by forcing it into the very mold which it is designed to avoid.[8] Since the Commission had to decide primarily a question of policy and only incidentally a question of fact, the technique of a trial would have been clumsy and wasteful.[9]

[8] Cf. Federal Communications Comm. v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656.

[9] Cf. Davis, The Requirement of Opportunity to be Heard in the Administrative Process, 51 Yale L.J. 1093, 1098.

Appellant could have had a hearing of the trial type if it had chosen to comply with the Commission's rule regarding petitions to intervene.